STATE OF MISSOURI, Respondent, v. AFTON SCOTT, Appellant, No. 41379—223 S. W. (2d) 453.

Court en Banc, September 26, 1949.

632

*Rogers & Rogers* for appellant.

*J. E. Taylor,* Attorney General, and *Frank W. Hayes,* Assistant Attorney General, for respondent.

634

 LEEDY, J.—Afton Scott was convicted of murder in the first degree in having shot and killed his wife, Verla, on March 29, 1948, in Wright County. The judgment imposed the extreme penalty in accordance with the verdict, and he appeals. The killing was admitted; the defense, insanity. Defendant, 48 years old, lived with his wife and 10 children on a farm in Douglas County about 6 or 7 miles from Mountain Grove, adjoining the farm of Andrew Torkelson. Defendant and his wife had trouble on the preceding Saturday, which resulted in his wife leaving home, taking her children with her, and going to the home of her mother, Mrs. Mary Raney, in Mountain Grove. On the afternoon of March 29, 1948, Judge Charles H. Jackson drove to the Torkelson farm to look at some cattle which he intended to purchase. Defendant learned of his presence there and went over to the Torkelson farm. He went to the barn where Judge Jackson and Torkelson were standing, and when first noticed by them, he had his gun leveled at Judge Jackson. He said, "Andrew, stand back." Judge Jackson said, "Scott, put that thing down. I have been a friend to you. I have helped you." The defendant replied, "I have got you where I want you. You have broke up my home." Whereupon, defendant fired a shot, killing Judge Jackson instantly.

After cautioning the Torkelsons not to attempt to stop him, he removed the wires from the Jackson and Torkelson cars so they could not be driven, got in his own car and drove away. He went to the home of his father in Mountain Grove, drew a diagram of his barn showing where he had hidden his money, and told his father what he had done, after which he drove to the home of his mother-in-law, Mrs. Raney, at Mountain Grove. When the defendant arrived at the home of Mrs. Raney, he got out of the car and went in. His wife, Verla, was sitting in the house holding the baby. The defendant told her he wanted to talk with her. She told him that if he had anything to say, to say it in the house. He told her he wanted to talk to her personally and to come on out and that he wanted to get home to do his chores. She was holding the baby at that time. He told her to put the baby down and she handed it to one of their daughters and both went outside. After they had gotten outside and before any conversation was had between them, Scott went to his car, took the gun therefrom and shot his wife. After the shooting, the

defendant got in his car, drove away, and on the morning of the second day thereafter surrendered to the State Patrol voluntarily. (It may be well at this point to say that the facts touching the killing of Judge Jackson were developed somewhat by consent because counsel' for defendant had informed the court that if the state did not prove them, that the defendant would as a part of his case and for the purpose of proving his defense of insanity.)

Defendant's plea to the jurisdiction challenges the authority of Judge Maughmer to try the case. He was transferred to the Wright Circuit Court by an order of the Supreme Court made pursuant to § 6, Art. V, Const. of Mo., 1945, and rule 11 of the Supreme Court. The facts are these: Judge Moulder, who succeeded Judge Jackson as the regular judge of the Wright Circuit Court, being unable to hold the June, 1948 Term (at which this case was docketed), made an order calling in Judge Blair of the 14th Circuit. Defendant filed an application for a change of venue "from Judge Blair," which Judge Blair sustained, but he did not call in another judge. Instead, Judge Moulder reappeared, and entered an order disqualifying himself, and requesting the Supreme Court to transfer another judge to sit in the case under the constitutional provision above mentioned. This was done, and Judge Maughmer was ordered transferred. Defendant contends that when the change of venue was taken from Judge Blair, it became his duty, under § 4040, R. S. '39, to call in another judge to try the case. It will be observed that, under the express provisions of that section, the duty to call in another judge arises only "if, . . . no person to try the case will serve when elected as such special judge" (provision for the election of an attorney possessing the qualifications of a circuit judge being made by § 4038, R. S. '39). These sections would seem to be of doubtful validity under the 1945 Constitution, but as that question is not briefed, it will not be determined. It may be well enough to point out that under § 29, Art. VI of the 1875 Constitution, certain provisions were made respecting substitute judges, and that the General Assembly was expressly authorized to "make such additional provision for holding court as may be found necessary." The new Constitution contains no such provision. On the contrary, its provisions are: "Any circuit judge may sit in any other circuit at the request of a judge thereof." [§ 15, Art. V.] "The supreme court may make temporary transfers of judicial personnel from one court to another as the administration of justice requires, and may establish rules with respect thereto." [§ 6, Art. V.] Even if § 4040 is still valid, it cannot be thought to override the later constitutional provision just mentioned. We hold Judge Maughmer's transfer under § 6, Art. V, to be valid, and he was, accordingly clothed with authority to hear the case.

■ Defendant complains of an incident where in qualifying the panel a prospective juror, one Sam Smith, stated in response to questions by the court that he knew defendant was guilty and should have to serve on a rock pile the rest of his life. The court, on its own motion, excused Smith instanter, and defendant then moved to discharge the entire panel. This was denied, and defendant assigns error, although he cites no authorities on the point. The trial court is in much better position than this court to evaluate the effect, if any, of such an unfortunate outburst upon the others, so it must be regarded as a matter to be confided to the discretion of the trial court. Upon the record before us, we are unwilling to say that there was any abuse of that discretion in denying the motion to declare a mistrial.

■ We find no merit in the contention respecting jurors Owens and Atkinson. ■ The motion for new trial charged that each was "related to the deceased and did not reveal this in his examination and defendant did not know about it until after the trial." It was developed on the hearing on the motion for new trial that Owens was a cousin of the wife of the deceased's brother, and that Atkinson's wife's mother and the deceased's grandfather were cousins. Atkinson's wife died in 1933 and there were no children born of the marriage. Defendant's brief expressly admits there was no such relationship as would disqualify the jurors, but his position is that, "it is evident from reading the testimony as given on the voir dire examination as compared with the testimony given on the hearing on the motion for a new trial that if the testimony given in the later instance had been given on the voir dire examination, neither of these men would have been left on the jury." While we have not been referred to any specific places in the record where this charge may be sustained, we have, nevertheless, read the record of their voir dire examinations as well as that on the motion for new trial, and we have reached the conclusion expressed by the trial court, that is, "taking up the items and bunching them all together, the court is of the opinion that the jury was properly qualified."

■ The deceased's mother was permitted to testify as to the size of the deceased—"I guess she was about 5 feet and maybe some inches; she was awfully thin." Defendant, claiming reversible error, insists "this testimony could have been admissible only on the question of self-defense, which was not in the case." State v. Talmage, 107 Mo. 543, 17 S. W. 990, and State v. Goddard, 162 Mo. 198, 62 S. W. 697, are relied on. We find nothing in those cases to support the contention. The Talmage case had to do with defendant's rejected offer to prove that the deceased had boxing gloves and practiced with them. That question is not akin to the one here involved. The Goddard case is no more helpful.

■ Defendant also complains of the introduction of the rifle and shells used in the homicide, and the testimony of the coroner as to the course of the bullet and the character of the wound. The sole objection in both instances was that, the killing having been admitted, such evidence was inflammatory and prejudicial. In State v. Clough, 327 Mo. 700, 38 S. W. 2d 36, the killing was admitted (self-defense) and the weapon alleged to have been used was held to be admissible, but the articles of clothing worn by the deceased were inadmissible. We think both matters complained of were within the sound discretion of the court, and it does not appear that that discretion was abused. The situation is not comparable to that presented in the exhibition of bloody clothing where its only effect could be to inflame the jury, such as in State v. Creed, 299 Mo. 307, 252 S. W. 678. See, also, State v. Sterling, (Mo.) 72 S. W. 2d 70.

■ The court gave instruction No. 3, the first paragraph of which, the defendant concedes, properly instructed on the presumption of innocence and the burden of proof, but he objects to the second paragraph, reading as follows: "However, you are instructed that with respect to the defense of 'not guilty of reason of insanity', as interposed by the defendant in this case, the burden is upon defendant to prove the existence of such insanity, as defined in these instructions, by a preponderance or greater weight of the evidence to your reasonable satisfaction, but defendant is not required to prove it beyond any reasonable doubt." This challenged portion properly declared the law, as held in a long line of cases. See State v. Duestrow, 137 Mo. 44, 38 S. W. 554; State v. Barbata, 336 Mo. 362, 80 S. W. 2d 865; State v. Sapp, 356 Mo. 705, 203 S. W. 2d 425. This being true, we fail to appreciate defendant's contention that this language nullified the preceding portion on the presumption of innocence and burden of proof. Such could not be its effect merely because appended to the same instruction instead of appearing elsewhere; for example, as a part of the main instruction on the defense of insanity, as in the cases just cited. An instruction on insanity in the form approved by those cases, and embodying the principle just noticed, was given by the court as instruction No. 8, the giving of which was assailed in defendant's motion for new ■ trial, but it failed to point out the particulars wherein it was erroneous. The only matter preserved for review in that connection was that the court should have told the jury that "If upon a consideration of all the evidence in the case, including the evidence touching the insanity of the defendant, you have a reasonable doubt as to the guilt or innocence of the defendant, you should acquit the defendant." We think the instructions amounted to as much. Witness the following excerpt from instruction No. 3: "The Court instructs the jury that . . . this presumption of innocence . . . at the end entitles the defendant to an acquittal, unless the evidence in the case, *when taken*

638

*as a whole,* satisfies you of defendant's guilt beyond a reasonable doubt, as defined in these instructions, and the burden of proving the guilt of the defendant is upon the State, and unless the State has sustained this burden your verdict should be that the defendant is not guilty.'' The evidence in the case ''when taken as a whole'' would necessarily include that touching the insanity of the defendant, and a jury of laymen of average intelligence would have no difficulty in so understanding.

Finally it is charged that at a recess during the progress of the trial the jury was allowed to go to the cemetery where Judge Jackson was buried, and to converse regarding his grave; and that such action was highly prejudicial to the rights of defendant. The sheriff was the single witness who testified as to the incident out of which this contention arose. He detailed the facts in this manner: He was one of the officers in charge of the jury. One morning after breakfast, but before court convened, the jurors asked him ''about walking over to the bridge—over to the lake'' (about a half mile south of Hartville toward Mansfield) for the purpose of getting some exercise, to which the sheriff agreed. He was walking toward the bridge with the jury and when they got about even with the driveway going into the cemetery (about half way to the bridge to which they had started), ''the traffic was coming pretty thick,'' and a passing car had come too close, so the sheriff remarked that they couldn't go over on this bridge because it would be too dangerous. Whereupon a juror (he could not remember which one) suggested that they walk up through the adjacent, unfenced cemetery, and they proceeded to do so. When they got about to the center of the cemetery, which would be 150 to 200 feet from the road, it occurred to the sheriff that Judge Jackson was buried in the cemetery, so he turned them around at that point, which was 50 steps or more from Judge Jackson's grave, and started back. About that time some juror asked him about where Judge Jackson's grave was, to which the sheriff replied, ''It is up there in the upper part of the cemetery, and we can't go up there.'' None of the jurors asked to go up and look at the grave. After standing in the shade of a pine tree, the party went on down to the lower part of the cemetery, looked at some old markers, and returned to town the way they had come. They were never closer than 150 feet to the grave. It appears that defendant's counsel had knowledge of, and discussed the incident with the sheriff within 15 minutes after it occurred.

Under the evidence there was no such unauthorized view or inspection of a scene or object involved in the case as comes within the condemnation of 64 C. J. § 787 and § 800, cited by defendant. While the incident was unfortunate, we find nothing to indicate any likelihood that the verdict was or could have been influenced by it. This view is buttressed by the fact that the evidence in respect to the

killing of Judge Jackson came into the case because defendant wanted it shown in support of his plea of insanity. We agree with the state that the place of his burial was so inconsequential, as compared with the facts in relation to his death, which defendant himself wanted introduced, that it could not possibly have had any effect upon the jury in arriving at its verdict.

This disposes of all of the points made in defendant's brief. In addition, we have examined the record proper, and find no reversible error in it. It follows that the judgment must be, and it is, affirmed. All concur.

Date of execution set for Friday, November 4, 1949.

