STATE OF MISSOURI, Respondent, v. VERDIE BARTON, Appellant, No. 43103—255 S. W. (2d) 752.

Court en Banc, March 9, 1953.

992

*Green & Green* for appellant.

*J. E. Taylor*, Attorney General, and *Julian L. O'Malley*, Assistant Attorney General, for respondent.

DALTON, J.—Defendant was convicted of grand larceny and sentenced to two years imprisonment in the state penitentiary.

He has appealed. On a prior appeal, a similar conviction and sentence was reversed and the cause remanded. State v. Barton, 361 Mo. 780, 236 S.W. (2d) 596.

The prosecution was instituted in Shannon county and went on change of venue to Reynolds county. The state's evidence tended to show that D. P. Hearn operated a general store at Teresita on Highway 60 in the west part of Shannon county. He had five rolls of fencing wire of the value of $65.50 stored near the end of a porch at the front of his store. On February 12, 1949, about 5:30, "just between sundown and dusk" a pickup truck drove just past the front of his store and stopped. Defendant and a Mr. Nash were in the truck. Defendant got out and came in the store and made a small purchase of some lunch goods and then went to the garden seed rack and looked over the garden seed until Nash came in. Defendant was in the store about 15 minutes, but after Nash came in, defendant paid for his small purchase and they went out and got in the truck. As they were leaving, Hearn saw that the truck was loaded with wire. He looked at the end of the porch, noticed that his wire was gone and he and a Mr. Buffington promptly started in pursuit of the truck. Three miles east of the store, near Montier, they found two rolls of wire lying in the road. The other three rolls were located at Nash's station a few miles west of Winona and some 15 miles from Teresita. Hearn notified the State Highway Patrol and defendant was found at Winona, where he had a small picture machine in a night club and was taking pictures for the purpose of selling them. Defendant denied taking the wire but admitted the wire was hauled in his pickup truck. He asked the price of the wire and wanted to pay for it.

Nash, a witness for the state, testified that he was a cousin of defendant and that they were together on February 12th, hauling strips to Nash's place in defendant's pickup truck. Nash testified: "We stopped at Teresita and Verdie said, 'We are going to get some wire.' He told me to load on five rolls of wire, that woven wire. I loaded it on. He went in the store and, I think, he bought a small box of crackers and some garden seed and some cookies. When we got ready to go, before we got in the pickup, I asked him—I said, 'Verdie, was the wire paid for?' He said, 'Everything was taken care of, get in.' We came on back down to my house." When they arrived at Nash's home they had only three rolls of wire and Nash helped defendant unload the wire back of Nash's mother's home.

Hubert Wright, a state highway patrolman who participated in making the arrest, testified that he found defendant "in the building there at the Rainbow Tavern taking pictures." "He (defendant) denied getting the wire and then said he would pay for it. * * * We asked him who was with him and he said nobody was with him when he got the wire. * * * We looked at the pickup and saw the

fresh wire marks on it. * * * He offered to pay for the wire or return it the next morning.''

Roy W. Schuenemeyer, a patrolman who accompanied Wright, testified: "We asked Verdie where he had been that evening or that day and he told us he had been up towards Mountain View. We asked if there was anybody with him and he said, 'Yes.' We asked who it was and he said he didn't know the fellow's name. We asked him what they had been doing and he said he had been drinking beer with him and didn't know exactly who he was. * * * We asked Verdie if he knew him (Hearn) and he said, 'Yes', he was the man at the store up at Teresita. We asked Verdie if he got the wire and he denied it at first and later stated he did not get the wire, but the other fellow with him loaded the wire on and he went on. Verdie stated that he asked this other fellow if the wire had been taken care of and he said this other fellow told him it was all right, that he knew the man and would take care of it. Then Verdie asked to talk to Mr. Hearn alone. * * * Verdie asked the sheriff if he could pay for the wire.''

Defendant in his own behalf testified that he had lived in Shannon county all his life near Winona; that the only thing he remembered with reference to what took place on February 12, 1949, was that he went with Pete Nash to Mountain View. "We went to see about selling a pickup truck, the last I remember is when I went to the gunsmith (in Mountain View) until the next morning when I woke up in jail" at Eminence. He said that he had been afflicted mentally and physically before February 12th; that he had heart trouble and high blood pressure, which had bothered him since about 1934; that he had blackouts or amnesia and passed out sometimes; that the attacks would come, "maybe a month apart or so, no definite time— you couldn't tell"; and that he had been taking treatment from Dr. Heart at Salem. He saw Dr. Heart first in August 1948, and visited him every week or two. He said he had a stroke on July 6, 1950, and it paralyzed his left side. He admitted that his picture machine was set up at the Rainbow-Tavern in Winona and that he had been working there with the picture machine all winter. He said that he just happened to be down there at the time of his arrest. He didn't remember telling the man he would pay for the wire. He quit driving his automobile in the summer of 1950, but was driving at the time of the trial in 1951 and he was also taking pictures and selling popcorn at Eminence in July 1951.

Dr. M. M. Heart, age 31, a physician and surgeon, who had practiced medicine for five years, testified that he first saw defendant in August 1948; that defendant had hardening of the arteries and high blood pressure and was nervous; that he prescribed medicine for defendant; that defendant's condition "with his hardening of the arteries" would have a tendency to cause him at times to black-

out; that the condition in which he found defendant would lead him to believe that defendant could suffer from blackouts for "some 30 seconds to a few hours, or actually a coma." [754] He had given defendant theobromide, a blood vessel dilator. Prior to February 12, 1949, defendant had mentioned to him that he had a feeling of insecurity and on occasions he could not remember like he should. He said he had seen defendant some nine times. The witness denied that he had told the jury that a man would blackout to the extent that he could travel the highway and carry on a picture taking business and not know what he was doing. He thought it was possible for defendant to go from four o'clock in the evening to eight o'clock the next morning without knowing what he was doing.

Appellant has not favored us with a brief and we find but one assignment of error in his motion for a new trial, to wit, that the court erred in giving Instruction No. 2 covering the defense of insanity. The instruction is as follows:

"The Court instructs the jury that if you find and believe from the evidence that the defendant at the time of the commission of the act charged in the information, if you should find and believe beyond a reasonable doubt from the evidence herein that he did commit such act, was so perverted, deranged, defective, or deficient, in one or more of his mental and moral faculties as to cause him to be incapable at the time of understanding that such act was wrong and in violation of the law of God and of society, you should acquit him upon the ground of insanity, but to hold the defendant criminally responsible it is only necessary that you should believe that the defendant at the time of the commission of the act charged against him, if you find and believe he did commit such act, had such a degree of mental capacity as to enable him to distinguish between right and wrong in reference to said act and to know that said act was criminal and wrong and would deserve punishment and then in law he had a criminal intent and was not so insane, mentally defective, or deficient, as to be exempt from the responsibilities of such act.

"The law does not excuse unless the mental derangement or impairment is so great that it actually renders the person incapable at the time of its commission of distinguishing between right and wrong as to the particular act proved against such person. The insanity of the defendant may be proven either by positive and direct proof or by circumstantial evidence. As the law presumes the defendant innocent, the burden of proving him guilty rests with the state, and before you should convict him, his guilt must be established to a moral certainty and beyond a reasonable doubt. On the other hand, to entitle the defendant to a verdict of not guilty, solely by reason of his insanity, the law requires him to prove it, not, however, beyond a reasonable doubt, but only by the preponderance or greater weight of the evidence.

"From all this it .follows that although you may believe and find that the defendant did commit the act charged against him, yet if from the evidence you further find that at the time he did it he was in such an insane, deranged, defective or deficient condition of mind that he did not know he was doing wrong, and did not comprehend the nature and character of the act, then such act was not, in law or in fact, malicious or felonious, and you ought to acquit him on the grounds of insanity, and by your verdict so say.

"The Court instructs the jury that if you find the defendant not guilty on the sole ground that he was insane at the time of the commission of the act charged, you will so state in your verdict, and you will also state whether the defendant has entirely and permanently recovered from such insanity."

It is contended the instruction is erroneous in three respects: (1) that the instruction erroneously "placed the burden on the defendant to prove he was not guilty of the charge against him by reason of insanity"; (2) that the instruction erroneously failed to require the state to prove defendant's guilt beyond a reasonable [755] doubt, because "the defendant in law is presumed to be innocent and the state must prove his guilt beyond a reasonable doubt, whether such reasonable doubt is based on insanity, self-defense, alibi, or other cause"; and (3) the instruction is erroneous, because under it the burden of proof was not sustained by the state. It is contended that defendant offered uncontradicted testimony that he "was suffering from a form of insanity at the time of the alleged commission of the offense" and the state offered no testimony to rebut such proof and, "therefore, such instruction deprived defendant of due process of law as guaranteed to him by the Constitution of the State of Missouri."

There is no merit in the first contention. It is clear from the principal opinion in the case of State v. Barton, supra, and from the opinion expressing a concurrence in the result reached in the principal opinion, that under the existing law of this state the burden of proving the defense of insanity by a preponderance of the evidence rests upon the defendant. State v. Barton, supra, 236 S.W. (2d) 596, 597 and 602; State v. Scott, 359 Mo. 631, 223 S.W. (2d) 453, 456; State v. Hardy, 359 Mo. 1169, 225 S.W. (2d) 693, 698; State v. Murphy, 338 Mo. 291, 90 S.W. (2d) 103, 109; State v. Hundley, 46 Mo. 414, 417; Sec. 546.510 RSMo. 1949.

While four of the judges concurred in the result reached by the principal opinion in State v. Barton and further concurred in the separate opinion of a fifth judge who also concurred in the result reached in the principal opinion, the separate opinion did not undertake to change the settled law of this state with reference to insanity being an affirmative defense, nor to change the established rule with reference to the burden of proof resting upon a defendant to

prove the defense of insanity by the preponderance of the evidence. Further, such rule, even if it required the defendant to prove such defense beyond a reasonable doubt, would not violate the due process clause of the Federal Constitution. Leland v. State of Oregon, 343 U.S. 790, 72 S.Ct. 1002, 1007.

Nor is Instruction No. 2 subject to the second criticism leveled against it, to wit, that it failed to require the state to prove defendant's guilt beyond reasonable doubt. The second criticism is effectively answered in the case of State v. Scott, supra, 223 S.W. (2d) 453, 456(7-9), where a similar complaint was made with reference to a similar instruction. In that case it was held that adding to an instruction on the presumption of innocence and burden of proof a further instruction that defendant had the burden of proving insanity as a defense was not erroneous as tending to nullify the first part of the instruction.

The third criticism is apparently based upon the theory that the instruction was unsupported by evidence because the state did not offer direct evidence of defendant's sanity to rebut the evidence offered by defendant. Defendant says that under this instruction the state did not sustain its burden of proof. There is no merit in this contention. Defendant testified at length before the jury. The jury not only saw him, but heard him examined and cross-examined. There was also evidence with reference to his actions, conduct and conversation on February 12, 1949, including his conversation with several witnesses at the time of his arrest. The issue as to defendant's sanity at the time of the alleged offense was for the jury. State v. Quilling, 363 Mo. 1016, 256 S.W. (2d) 751, handed down herewith.

The information properly charged the offense of grand larceny and the evidence offered and shown by the record was substantial and sufficient to support the verdict of "guilty of grand larceny, as charged in the information." The verdict is in due form and the punishment assessed is within the limits provided by statute. Sec. 560.160 RSMo 1949. Allocution was granted and defendant was duly sentenced and judgment was entered in accordance with the verdict.

The judgment is affirmed. All concur.