STATE of Missouri, Plaintiff-Respondent,

v.

Theodore Roosevelt JOHNSON, Jr., Defendant-Appellant.

No. 35416.

Missouri Court of Appeals, St. Louis District, Division One.

May 4, 1976.

Motion for Rehearing or Transfer to Court En Banc or Transfer to Supreme Court Denied June 15, 1976.

Application to Transfer Denied Sept. 13, 1976.

William J. Shaw, Public Defender, Alan G. Kimbrell, Asst. Public Defender, Clayton, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, Wm. F. Arnet, W. Mitchell Elliott, Asst. Attys. Gen., Jefferson City, Courtney Goodman, Jr., Pros. Atty., Charles Merz, Asst. Pros. Atty., Clayton, for plaintiff-respondent.

WEIER, Presiding Judge.

On February 1, 1973 defendant was convicted by a jury of two counts of first degree murder, two counts of assault with intent to kill with malice, and two counts of robbery first degree by means of a danger-

ous and deadly weapon. He was sentenced to two concurrent life terms and to four concurrent terms of ninety-nine years, the latter to run consecutive to the life terms. The transcript is voluminous. The briefs are lengthy with numerous citations. Consideration will be given to such of his assignments of error as were properly preserved for review and may now or hereafter bear meritoriously upon this cause.

Defendant does not attack the sufficiency of the evidence. The jury could reasonably find the facts to be as follows. Shortly before 1:30 a. m. on March 18, 1972, several young black men armed with various weapons including sawed-off shotguns, entered and robbed a Maplewood tavern named Cousin Hugo's. The tavern has two rooms and is L-shaped. The room first entered contains the bar. The back room, containing tables and space for dancing, is reached through an open doorway at the far end of the first room. Because of the physical arrangement of the tavern, all of the patrons did not see all of the robbers. Most of the patrons in the back room saw only two robbers. Three patrons who were in the front room, however, testified that they saw a total of five robbers. A young man driving past the tavern with friends that evening also saw five blacks come out of the tavern door. He saw one of them fire a shot.

During the robbery a barmaid was stabbed and one patron was shot in the knee and hip. Two patrons were killed, one by a stab wound and another, an off-duty police officer, by a shotgun wound of the head. When the police officer went off duty at 12:15 a. m. on March 18, he was carrying his service revolver and his holster. Neither the revolver nor the holster were found on him when he was taken to the hospital following the incident.

A resident of the area said that he had seen several blacks, one of whom he recognized as Robert Lucius Toney, drive past the tavern at about 5:00 p. m. the previous afternoon. Based upon information given them by this witness, three officers went to Toney's address. Toney's mother was there. When asked the whereabouts of her son she became extremely agitated and finally hurried down the street to a house around the corner on Banneker Street shouting "Lucius, Lucius, the police." When Toney came out onto the porch of the Banneker house, the officers asked for and were granted permission by Toney to enter. After they entered, Toney ran past them to the bedroom door. At the same time, another person was observed running into the bathroom. Sergeant Boulch pursued Toney and observed two more black males in the bedroom. He also saw what appeared to be a shotgun butt on the floor. All four persons in the Banneker house, including defendant, were placed under arrest. A fifth person, Robert Alfred, was also taken into custody when he appeared on the porch of the house moments thereafter. Alfred was later released for lack of evidence, and James Roy Hill was arrested.

Numerous officers soon arrived at the Banneker house to assist in the arrest and to gather evidence. A large, unruly crowd gathered outside and began pounding on windows and walls. The officers were therefore ordered to leave before their investigation was completed. They took with them various items, among them a .38 caliber pistol later identified as that of the dead police officer, and a holster similar to his, a knife, and a bag full of wallets, purses, credit cards and the like, many of them later identified by victims of the robbery. Officers from the fingerprint unit obtained six identifiable prints from the items in the bag. Two of them were the fingerprints of the defendant. One print was found on a check-cashing card belonging to one of the robbery victims, and the other on an unidentified wallet also found in the bag of loot.

Two barmaids testified that defendant came into the bar late Friday afternoon, March 17, to purchase popcorn or potato chips. One testified that later she saw defendant during the robbery standing across the bar from her with a shotgun. Two patrons also identified defendant as one of the robbers. Additional facts are discussed

when relevant to the various points of alleged error.

## I. EXPERT TESTIMONY

Defendant's first three points on appeal involve the use of expert testimony regarding gunshot residue test results obtained by neutron activation analysis. Because they are closely related, these three points will be considered together.

Defendant's hands were tested for gunshot residue by neutron activation analysis. This testing required several steps. In this case, Robert Roither, a criminalist with the St. Louis County Police Department, who had a B.S. degree in chemistry, took five gunshot residue kits with him to the Maplewood Police Department to test the five persons arrested at the Banneker address. Roither received personal instruction in the use of these kits from Dr. James Vogt, manager of the University of Missouri Nuclear Research Facility at Columbia, Missouri. The sealed kits contained plastic bags, small plastic vials and five dilute acid and cotton swabs—one each for the front and back of both hands and an extra swab which was used as a control to test for and insure against contamination. After the subject's hands were swabbed, each swab was placed in an individual plastic vial. Each vial was sealed in a plastic bag which was marked with the subject's name and location of the swabbing; i. e., which hand and whether it was the front or back of the hand. Roither swabbed defendant's hands on the morning of his arrest and delivered the kits to Donald Brocksmith, director of the St. Louis County Police Laboratory, who in turn delivered them to Dr. Matt Eichor at the Nuclear Research Facility. Dr. Eichor supervised the analysis of the swabs and recorded the presence of micrograms of two elements, barium and antimony, both being used in primer compositions for ammunitions. It is the degree to which these elements are present on a suspect's hands that indicates the likelihood of his having recently handled or discharged a firearm. Dr. Eichor then submitted data of the test results to Dr. Vogt, the director,

who was responsible for ultimately reaching a conclusion. Obviously, no one individual could or did perform all the steps.

 The general rule is that results of scientific tests and expert opinions based thereon are admissible only if the scientific principle involved is generally considered reliable and accurate by the concerned scientific community. Gunshot residue testing by neutron activation analysis meets this requirement. Neutron activation analysis has proven to be a highly reliable technique for detecting gunshot residue and for determining whether a person has recently handled or discharged a firearm. Reliability of evidence obtained by this means was settled in Missouri in *State v. Ross*, 523 S.W.2d 841, 845[5] (Mo.App.1975) which held that "firearm residue testing by neutron activation analysis has crossed the line between the experimental and demonstrable stages and the evidential force of the principle must be recognized." Defendant argues that even if this particular use of neutron activation analysis is generally accepted in the scientific community, there was no evidence that the technique used in this case has gained general acceptance. The technique employed is the same as that described in *State v. Ross, supra* at 844[3, 4]. It is not true, as defendant asserts, that there was substantial evidence that the technique of taking samples by swabbing a suspect's hands as opposed to pouring on hot paraffin is not generally accepted. The evidence indicated only that it is not the sole method for obtaining samples. Objections to the manner in which the analysis was conducted go to the weight rather than to the admissibility of the evidence. *United States v. Stifel*, 433 F.2d 431, 435[2] (6th Cir. 1970), *cert. denied* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971); Annot., 50 A.L.R.3d 117, 127 (1973). *See generally,* Watkins & Watkins, *Identification of Substances by Neutron Activation Analysis*, 15 Am.Jur. Proof of Facts, 115 (1964).

It would serve no useful purpose to recount in full defendant's arguments in support of his attack upon the qualifications of the state's expert witnesses. He contends,

in essence, that there was no evidence that Dr. Eichor was qualified to perform any but one portion of the analysis; that if he was, it was not he who ran the tests; that even if the results obtained were arrived at by qualified experts, those results are meaningless without background data to which they can be compared; and that Dr. Vogt compared the results to his own background data rather than that of another expert, Dr. Guinn.

■ The determination of an expert's qualifications to draw an opinion is for the trial court's discretion and will not be overturned on appeal absent an abuse of that discretion. *State v. Stevens*, 467 S.W.2d 10, 23[12] (Mo.1971), *cert. denied* 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546 (1971). The record amply supports the conclusion that both Dr. Eichor and Dr. Vogt are highly trained, skilled scientists; the first, competent to supervise and participate in the conduct of the analysis, the second, to interpret the results. It cannot be seriously maintained that the trial court erred or abused its discretion in this regard. *See State v. Stevens, supra* at 23[13].

■ Certainly, as defendant asserts, it is improper for one expert to base his opinion upon the oral or written opinion of another expert unless the opinion relied upon is in evidence and included in a hypothetical question. *Hornberger v. St. Louis Public Service Company*, 353 S.W.2d 635, 641[4, 5] (Mo.1962); *State v. Johnson*, 504 S.W.2d 334, 336[1–3] (Mo.App.1973). Dr. Vogt, however, was not relying upon or testifying to the opinion of another. Dr. Eichor presented Dr. Vogt not with an opinion but with data, the statistical results of a scientific test which was introduced in the evidence. Dr. Vogt was the only expert to arrive at any conclusions based upon that data, and the only expert to testify to his opinion as a result of those conclusions. *Hornberger, supra,* and the proposition for which it is cited, is therefore inapplicable to the circumstances of the case at bar.

■ A question propounded to an expert witness is generally viewed as improper when it calls for his opinion on the basis of statements or reports not in evidence or which are inadmissible as substantive evidence under the hearsay rule. *Conlon v. Roeder*, 418 S.W.2d 152, 157 (Mo.1967). Reports of others upon which an expert's opinion testimony is based deserve close scrutiny. But if the expert personally supervises the tests upon which he testifies and the results are collated in a report prepared by his subordinate but under his supervision and direction which is introduced in the evidence, then he may base his opinion upon the factual date therein contained. Dr. Vogt testified that he personally supervised the analysis tests. Dr. Eichor, one of six chemists who worked under Vogt's supervision, testified as to the tests and the collection of the data submitted to Dr. Vogt. Three technicians operate the reactor and monitor the instruments. To require Dr. Vogt to perform these functions before he could testify as to the results would be an absurdity.

■ An opinion may not be based upon the conclusions or tests of others. But it is proper for an expert to testify and give his opinion from tests conducted by him and facts within his own knowledge. *DeDonato v. Wells*, 328 Mo. 448, 41 S.W.2d 184, 187[1–4] (1931). As stated in that opinion, it would seem that a witness' opinion based on and supported by his own personal observation and knowledge would be more likely to be correct than when the facts are merely hypothetical. It was not error, therefore, to permit Dr. Vogt to testify to his opinion based upon the laboratory analysis.

On direct examination, Dr. Vogt testified that in his opinion the test results indicated that all five subjects tested, including defendant, had recently handled a firearm. During cross-examination defense counsel asked Dr. Vogt to read from a letter written by him on May 15, 1972 to the director of the St. Louis County Police Laboratory which stated that if a person has fired a gun, there should be significantly more barium and antimony on one hand than on the other. On the basis of information available to him at that time, Dr. Vogt in this

letter stated he considered the test results inconclusive since they did not show the usual variation between the left and right hands of the suspects, even though both elements were present in high amounts. The letter also stated that the explanation might lay in the fact that shotguns and a rifle were used rather than handguns. The letters constituted Dr. Vogt's initial but not his final report. On redirect, Dr. Vogt explained that " * * * at that time we had not done extensive work with rifles or shotguns. Most of the work that we had done had been on revolvers. When one fires a revolver * * * with his right hand, obviously one would anticipate having more residue both on the palm and back of the right hand than on the left. So there is a variation from one hand to another typically when one fires a pistol. And at that time we had not had extensive experience with rifles or shotguns. Since that time we have received many cases from all over the State of Missouri and have had occasion to do a number of samples with rifles and shotguns, and it has been our observation with these particular types of weapons that you get a residue deposited on both hands, * * *. This is why we revised our initial interpretation." Based upon the additional data Dr. Vogt sent a second report which read as follows: " 'Based on the rather extensive data we have accumulated on gunshot residues during the past six months, we have updated our original interpretation of the results of gunshot residue tests performed on the hands of [all five persons tested]. * * * The results of the analyses * * * are all indicative of each of these persons having recently handled and discharged a firearm.' " Dr. Vogt was allowed to read this letter on redirect examination over defense counsel's objection that it constituted "getting an expert opinion into evidence."

Defendant now argues that admission of the second letter was improper in that it constituted an additional expert opinion without proper foundation and was inadmissible corroboration and rehabilitation of a witness who had been impeached by a prior inconsistent statement.

■ Arguments in support of the allegation that the letter was an expert opinion admitted without proper foundation are the same as those previously discussed and for the same reasons are rejected. Objection on the ground that this was improper corroboration and rehabilitation of a witness who had been impeached by a prior inconsistent statement was not raised at trial, nor included in the motion for a new trial, and hence is not preserved for appellate review. Presentation of the alleged error to the trial court by timely objection and inclusion of the alleged error in the motion for a new trial is required. See *State v. Stucker*, 518 S.W.2d 219, 221[1] (Mo.App. 1974).

■ Even if preserved, defendant's point is without merit. The situation presented was not one in which a witness who was impeached by proof of statements made by him that were inconsistent with his trial testimony was sought to be rehabilitated by a consistent statement made subsequent to the impeaching statement. The cases relied upon by defendant prohibit such rehabilitation but are not on point. The letter of May 15, 1972, introduced by defense counsel on cross-examination, merely stated that at that time results were inconclusive. It was perfectly proper, then, on redirect to permit the witness to explain the intervening circumstances that had enabled him to arrive at a conclusion. To permit reply to new matter drawn out on cross-examination is the normal function of the redirect, and examination for that purpose is a matter of right. The rule is that " 'after a witness has been cross-examined the party calling him may by redirect examination, afford the witness opportunity to make full explanation of the matters made the subject of cross-examination so as to rebut the discrediting effect of his testimony on cross-examination and correct any wrong impression which may have been created.' " *Johnson v. Minihan*, 355 Mo. 1208, 200 S.W.2d 334, 336[1, 2] (1947). In addition, the scope and extent to which redirect examination of a witness shall be permitted

to go is a matter to be left largely to the discretion of the trial court whose ruling will stand absent an abuse of that discretion. *Johnson v. Minihan, supra* at 336[3]. Since the accepted purpose of redirect examination is to give a witness an opportunity to rebut or avoid the effect of testimony elicited in his cross-examination, he may properly be questioned regarding matters that tend to refute or remove any unfavorable implications that might have arisen from matters brought out on cross-examination. *State v. Price*, 513 S.W.2d 392, 396 (Mo.1974); *Cooley v. St. Louis Public Service Co.*, 236 S.W.2d 31, 35[3] (Mo.App.1951). The trial court properly permitted Dr. Vogt to correct the wrong impression created on cross-examination. In addition, the two letters disclose the invalidity of defendant's charge that the test results were meaningless because of insufficient background data. No conclusions were here drawn by the expert until sufficient data was available.

Defendant cites *Harp v. Illinois Central Railroad Company*, 370 S.W.2d 387, 391[3] (Mo.1963) for the proposition that if a witness does not have personal knowledge of facts supported by competent evidence which will give his opinion sufficient probative force to be considered substantial evidence, then he must be asked by use of a hypothetical question to assume the truth of those facts. He argues that Dr. Vogt, the expert, had no personal knowledge of the following matters: (1) that instruments used were functioning properly, (2) that defendant's hands remained uncontaminated between arrest and swabbing, (3) that the swabs used were uncontaminated, (4) that all steps, from swabbing to measurement of radioactivity, were done properly, and (5) that the swabs tested were the same used to swab defendant's hands and were in the same condition as at the time of swabbing.

Regarding the first point, defendant relies on *City of St. Louis v. Boecker*, 370 S.W.2d 731 (Mo.App.1963) for the proposition that results of the neutron activation analysis were inadmissible because

there was no evidence that the instruments used were checked and found to be in proper working order at or near the time of the test. The case relied upon involved a radar speedmeter. The court there noted that speedmeters must be checked for accuracy each time they are set up for use since proper functioning is easily affected by movement. *City of St. Louis v. Boecker, supra* at 736[4]. The instrument involved in the instant case is a nuclear reactor. The dissimilarity is obvious and the case relied upon is not at all on point. Dr. Vogt testified at length regarding the extensive measures taken to insure that the instruments involved here are in proper working order. We find, as did the court in *State v. Stevens, supra*, 467 S.W.2d at 23[14], in which precisely the same issue was raised, that his testimony established a prima facie case of accuracy and reliability. Here, as in *Stevens*, there was no evidence to the contrary.

Our response to the second point is that this is not akin to the situation in which an item is taken from defendant's control and later sought to be admitted into evidence against him without any proof that the item is in the same condition for relevant purposes, *State v. Myers*, 351 Mo. 332, 172 S.W.2d 946, 949–50 (1943), or proof that the item is the same one, *State v. Sockel*, 490 S.W.2d 336 (Mo.App.1973). The items defendant here maintains were not proven to be in the same condition between arrest and swabbing are his hands. Defense counsel thoroughly examined witnesses regarding the possibility that his client's hands were contaminated during handcuffing or by other means. The danger sought to be avoided by the law of the cases cited is not presented by these facts and they are therefore inapplicable. Any evidence of possible contamination was brought out on cross-examination and was available for jury consideration. Defendant points out that there was no evidence whether he was fingerprinted before or after swabbing nor whether the ink used contains barium or antimony. These matters were proper subjects for cross-examination but are not now matters for speculation.

The third contention, that Dr. Vogt did not personally know and there was no evidence to prove that the Q-tips used were uncontaminated or that they did not become contaminated at the time of swabbing, simply ignores the evidence. The gunshot residue kits come sealed and include a blank or control swab. The "control" swab is included in the kit and tested with the others to determine if contamination has occurred. Dr. Vogt testified that barium and antimony levels of the control swab were .0001 micrograms and .0002 micrograms, significantly lower than the amounts found on the other four swabs.

The fourth and fifth points suggest, as do the others, that an expert in Dr. Vogt's field may not give his opinion whether test results indicate a probability that defendant handled or discharged a firearm because he did not personally conduct or supervise the entire procedure; he could not himself verify the entire chain of custody; and further, that his opinion was actually based upon the opinion of another expert, Dr. Eichor. The latter objection has already been considered and ruled against defendant.

The suggestion that Dr. Vogt's opinion is inadmissible because he cannot establish the chain of custody by personal knowledge and himself negative the possibility that anything went amiss is frivolous. The requirement that the proponent of evidence must establish the chain of custody is well established. *State v. Alderman*, 498 S.W.2d 69, 72[3–6] (Mo.App.1973); *State v. Heather*, 498 S.W.2d 300, 306[10, 11] (Mo. App.1973). But chain of custody evidence need not negative every possibility that something might have disturbed the object in question. It need only show with reasonable assurance that the samples were those taken from defendant and were not therefore altered or contaminated. See *State v. Baines*, 394 S.W.2d 312, 316[6, 7] (Mo.1965). See also *State v. Heather, supra*. Here, evidence adequately establishing the chain of custody was presented by the state.

Contentions that there was no evidence that defendant's hands were swabbed, or that the swabs were placed in the kit labeled with his name or that they were properly subjected to the entire process can be made only by ignoring the record. These events were clearly and adequately established and need not be further discussed.

## II. FAILURE TO GRANT A CONTINUANCE

Defendant alleges that the court erred in refusing to recess the trial for forty-eight hours to permit him to present the testimony of Dr. Vincent Guinn, an authority on the application of neutron activation analysis to gunshot residue, to rebut the testimony of the state's expert witness, Dr. Vogt. The trial began January 22, 1973. The state closed January 30. Defendant called eight witnesses on Wednesday, January 31, and indicated he was ready to close his case except that he desired the testimony of Dr. Guinn who could not appear until February 3. He requested adjournment until that date and an offer of proof was made regarding the expected testimony. The court denied the request.

Defendant also alleges error in the court's failure to grant a continuance requested before trial because of the unavailability of two witnesses, Nathaniel Heard and Robert Alfred, and because testing by neutron activation analysis of mud samples taken from the top of the bar and from another defendant's boots was uncompleted. Nathaniel Heard was expected to testify that James Roy Hill, later tried and convicted, told Heard he shot Officer Gallino. The results of analysis of the mud samples were expected to show that Louis Jones, also tried and convicted, was in the tavern the night of the robbery. Robert Alfred was to testify that he did not handle or fire a weapon for days prior to his arrest on March 18 thus casting doubt upon the validity of the tests and Dr. Vogt's opinion.

The law in Missouri is well settled that granting or denying a continuance on the ground of absence or unavailability of witnesses rests within the sound discretion of the trial court. That discretion will not be interfered with unless manifestly

abused. *State v. Reece,* 505 S.W.2d 50, 52[2] (Mo.1974). "[A] conviction will not be set aside unless it is reasonably probable that a different result would have obtained if the absent witness had testified." Id. p. 52[4]. "Denial of a continuance for purposes of securing absent witnesses whose purported testimony would not bear directly upon the guilt or innocence of the defendant is not error, *State v. McKeever,* 339 Mo. 1066, 101 S.W.2d 22, 26 (1936), or where the testimony of absent witnesses is not material, *State v. Steele,* 280 Mo. 63, 217 S.W. 80 (1919), * * *." *State v. Reece, supra* at 52[6]; Rule 25.08.

Defendant states that Dr. Guinn's testimony, if believed, would have negated Dr. Vogt's opinion that defendant had recently handled or discharged a firearm and also would have offered an alternative explanation for the test results. Even if we assume that the witnesses could have reduced the impact of Dr. Vogt's testimony, the matter cannot be said to bear directly on the issue of defendant's guilt or innocence. There was evidence before the jury to indicate that not all participants in the robbery had a gun, that not all those who had guns fired them, and that Robert Alfred was not charged although the gunshot residue test of his hands yielded the same result as for the others tested. Sufficient facts were before the jury to permit them to consider the weight to be given Dr. Vogt's testimony. Further, it was not necessary to find that defendant had handled or discharged a firearm to find him guilty of the crimes charged. Under § 556.170, RSMo 1969, all persons who participate in a crime may be charged, tried, convicted and punished alike. *State v. West,* 484 S.W.2d 191, 195[4, 5] (Mo.1972); *Rowden v. State,* 493 S.W.2d 699, 702[4] (Mo.App.1973).

■ This request for adjournment was a matter clearly within the discretion of the trial judge and no abuse of discretion appears in the record. *State v. Odom,* 369 S.W.2d 173, 183[3] (Mo. banc 1963).

Defendant further argues that the testimony of Heard and the soil test results were important to his theory that only four persons committed the offense and that the four were Davis, Toney, Hill and Jones. The prosecution's evidence established that five persons participated in the offense. Proving that Davis, Hill, Toney and Jones were there would not establish that Johnson was not. Defendant was not prejudiced by the court's refusal to grant the continuance.

## III. ADMISSION OF DEFENDANT'S FALSE EXCULPATORY STATEMENT

During the trial, the following testimony was elicited from Officer Joseph Bokal:

"Q: Where were you taking him [defendant] from and to?

"A: From the inside of the County police building to the parking lot where there was a paddy wagon.

"MR. KIMBRELL [defense counsel]: May we approach the bench? . . . . . (out of the jury's hearing) Judge, Mr. Merz is apparently leading toward a statement allegedly made by defendant at the time. He previously indicated to me he had not decided whether or not to go into this matter. Since he apparently is, I would ask here out of the presence of the jury a ruling on the *relevancy* and admissibility of this statement.

"MR. MERZ: Judge, the evidence will show that the officer overheard defendant say, not in response to any question, that 'They can't get me for this; I was in the workhouse when the pig was killed,' or words to that effect * * *.

"THE COURT: In other words, it's exculpatory in nature rather than incriminating?

"MR. MERZ: That's correct.

"THE COURT: All right." (Emphasis added.)

Further discussion was had off the record and the officer was allowed to testify to having overheard the remark. Just prior to the close of the state's case, both counsel stipulated that the workhouse records, if produced, would show that neither a Theodore Johnson nor a Theodore Roosevelt Johnson appeared therein on March 17 or

18, 1972. Defense counsel then stated that "the defendant now objects to any reference to the defendant's having been in the workhouse whatsoever as being highly prejudicial and inflammatory." The objection was overruled. The court accepted the stipulation and then admonished counsel for both sides to refrain from further mention of the workhouse and from reference in final argument to the statement elicited from the officer. No reason was given for the ruling. Defendant correctly points out that the admonition was ignored or forgotten by the prosecuting attorney in his closing argument but made no objection at that time. Defense counsel also ignored the admonition in his closing argument.

Defense counsel's objections at trial raised the issues of relevancy and of the prejudicial and inflammatory effect of the statement. His motion for new trial adds that the statement implied a prior criminal conviction and was an attack on defendant's character. In the brief on appeal he includes the contention that he was entitled to a hearing to determine whether the statement was voluntary. The latter allegation was never presented to the trial court and was not preserved for review in the motion for a new trial as required by Rule 27.20(a), RSMo 1969. *State v. Lovell,* 506 S.W.2d 441, 445[7] (Mo. banc 1974). It need not be considered on appeal.

 Defendant correctly points out that statements obtained in violation of the rules established in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) are inadmissible whether inculpatory or exculpatory. It is clear in the instant case, however, that *Miranda* warnings were previously given and that defendant made the remark when not being questioned or addressed in any way by police officers. The situation here is closely analogous to that in *State v. Mitchell,* 491 S.W.2d 292, 296[4] (Mo. banc 1973). Defendant there objected to the testimony of a sheriff regarding an inculpatory statement which he overheard defendant make to a fellow prisoner. The court noted that the statement was not a product of interrogation but was voluntari-

ly made and was therefore not within the purview of the *Miranda* decision. Such is the case here.

 Defendant's objection to introduction of the statement on the ground of relevancy must be rejected. The statement was exculpatory, *i. e.,* an assertion intended at the time it was made to exculpate rather than incriminate the speaker. Some authorities consider it as an admission against interest while others consider it in a separate category of its own. *State v. Cobb,* 2 Ariz.App. 71, 406 P.2d 421, 423 (1965). However they are categorized, exculpatory statements are frequently offered by the prosecution as evidence of a consciousness of guilt. The issue of their relevance was discussed in Missouri in *State v. Bridges,* 349 S.W.2d 214, 216[2] (Mo.1961). Defendant there alleged that it was error to permit a police officer to testify to an exculpatory statement by defendant that he was elsewhere when the crime occurred. The statement was proven false. The court said:

"The state is not limited to proof of inculpatory declarations of the defendant since self-serving statements are also admissible where they tend to show a consciousness of guilt and a desire or disposition to conceal the defendant's criminal agency. The general rule of broader application is thus stated in *State v. Walker,* 357 Mo. 394, 208 S.W.2d 233, 236[1]: 'The general rule is that acts, conduct, and declarations of the accused occurring after the commission of an alleged offense which are relevant and tend to show a consciousness of guilt, or a desire or disposition to conceal the crime, are admissible in evidence.'"

The false alibi was held properly admitted.

 Defendant properly preserved his objection to admission of the statement on the ground that it was prejudicial and inflammatory. It is well settled that if competent and relevant evidence is received, it does not become inadmissible or erroneous merely because it is prejudicial or may tend to inflame the jury against a party. In considering its admissibility, the standard of relevance is the main criterion. *State v.*

*King,* 334 S.W.2d 34, 38[6] (Mo.1960); *State v. Johnson,* 234 S.W.2d 219, 222[3] (Mo. 1950).

## IV. ADMISSION OF A WALLET NOT SPECIFICALLY IDENTIFIED BUT FOUND WITH ITEMS TAKEN IN THE ROBBERY AND OF A FINGER-PRINT FOUND ON THE WALLET

Defendant complains of the introduction into evidence of a wallet and a fingerprint taken therefrom. The wallet was discovered in a green trash bag found in the bathroom of the house in which appellant was arrested. Also in the bag were numerous items clearly identified as belonging to victims of the robbery. The fingerprints lifted from the wallet matched defendant's right index finger. None of the victims who testified identified the wallet as theirs. Another of defendant's prints was taken from another of the items in the bag—a check cashing card belonging to Sherrell Hagerty and identified by her as taken in the robbery. The fingerprints of two other persons also charged with this crime were found on other items in the bag also identified as fruits of the robbery.

Defendant contends that the admission of the wallet and fingerprint was error since they had not been sufficiently identified or connected with this shooting and that their admission was prejudicial. A similar contention was made in *State v. Johnson,* 286 S.W.2d 787 (Mo.1956), which is dispositive of this issue. Defendant Johnson there objected to the admission of various articles, some found in the basement of an unfinished house and others in a garage in which one of the robbers other than Johnson was arrested. The court said: "Here a group of objects was thus left surreptitiously in the basement of an unoccupied house under circumstances indicating an intentional concealment or abandonment, and some of these have been specifically connected up with the robbery and with the defendant. We think that under such circumstances all of them were admissible." The objects found in the garage were held to come within the same category. *State v. Johnson, supra* at 792[6].

In the instant case, defendant was arrested in the bedroom of the house on Banneker. The evidence objected to was found only moments later in the bathroom. In the same bag were numerous items of personal property—a purse, papers, credit cards, driver's licenses, wallets—most of which were identified as belonging to victims of this robbery. One may reasonably infer that the wallet was taken in the robbery and further that the appellant had handled it. The determination of the admissibility of such real or "demonstrative" evidence is discretionary with the trial court. *State v. Scott,* 359 Mo. 631, 223 S.W.2d 453, 456 (Mo. banc 1949). That discretion was not abused here.

## V. CONFIDENTIAL INFORMANTS

Defendant asserts that the trial court erred (1) in sustaining the state's objection to defense counsel's question on cross-examination that called for the police officer to reveal the identity of a confidential informant, and (2) in overruling his request for disclosure of the name of a police officer who allegedly knew the identity of a person who defendant maintains was another confidential informant.

During direct examination by the state, Major Lowery of the police was asked:

"Q: Were any vehicles located or found that could be established were connected with this offense?

"A: We could never establish what car was used in the offense.

"Q: Did you ever have any information as to the type car, if any, that the persons who perpetrated the robbery used to get away in?

"A: We did have some information, yes. * * * We had information that the '67 metallic blue Chevrolet was used.

"Q: Where did that information come from?

"A: It came from a confidential informant."

During cross-examination, defendant's counsel attempted to establish the infor-

mant was a witness and tried several times to obtain from Lowery the names of the informant and the officer who received the information. As to the informant being a witness, Lowery definitely stated he was not. As to obtaining the names, objection by the prosecutor was sustained each time.

While it is difficult to ascertain precisely what argument is being advanced in support of defendant's position, it is clear that he believes he was entitled to have the identity of the informant or informants revealed. He states that the defense theory was either that there were only four robbers in the tavern or, if there were five, the fifth was Robert Alfred and not defendant. He argues further that since Alfred was arrested when he appeared on the front porch of the Banneker Street house moments after the arrest of defendant and the other persons present when the police arrived, and since Dr. Vogt's opinion was that Alfred had recently "handled and discharged a firearm", any information that Alfred had been an active participant in the offense was crucial to defendant's case. He asserts that because the informant "supplied the information prior to the arrest, it is virtually an inescapable conclusion that he was either an eyewitness to or a participant in the offense, or, at least, that he had direct personal knowledge of Alfred's involvement" and therefore "the informant possessed information favorable to the defendant".

The officer testified that the informant was not a witness. There is no evidence that he was a participant. Neither of the alleged informant's tips, that regarding the blue Chevrolet and that leading to Alfred's arrest, were demonstrated to have led to defendant's arrest or conviction nor was it shown that any evidence discovered as a result of the alleged tips was used against this defendant at his trial. The police were unable to establish what car, if any, was used, and Alfred was released for lack of evidence.

■ There are two distinct problems presented by this allegation of error. One request at trial was for disclosure of the identity of a confidential informant and the other was for the name of a police officer who allegedly received information leading to Alfred's arrest and presumably could testify to that communication. Defendant makes the distinction in his brief on appeal only in setting out his point of error. His argument and supporting authorities deal solely with the issue of the right to disclosure of an informant's identity rather than the right to have the identity of the officer or his testimony regarding the communication. He does not discuss his right to have the officer's identity or testimony, nor does he cite any authority in support of that right. He therefore has failed to comply with Rule 84.04(d) which requires citation of authority. This rule is applicable in criminal cases. Rule 28.18. Failure to cite authorities has provided grounds for dismissal, *In re Estate of James,* 459 S.W.2d 536, 539[5] (Mo.App.1970), and for refusal to review issues on appeal, *Robinson v. Gerber,* 454 S.W.2d 933, 938[7] (Mo.App.1970). Rule 28.02 provides in part: "Allegations of error not briefed on appeal, * * * will be deemed waived or abandoned." Rule 84.-04(d) requires points relied on to state wherein and why rulings of the court are claimed to be erroneous "with citations of authorities thereunder." Points of error not carried forward in the argument portion of defendant's brief are deemed abandoned or waived. *State v. Heitman,* 473 S.W.2d 722, 727[4] (Mo.1971); *State v. Sykes,* 436 S.W.2d 32, 33[1] (Mo.1969).

■ The modern rule regarding the privilege of the state to withhold the identity of persons who furnish information to law enforcement officers is expressed in *State v. Taylor,* 508 S.W.2d 506, 511 (Mo. App.1974). Generally, there is a privilege to withhold identity. This, like all privileges, is an exception to the usual rule that all relevant, material and competent evidence be revealed if called for. The purpose of the exception for an informant's identity is to encourage a citizen to communicate to his government any information he has of

the commission of crimes against it. "While at one time the privilege was absolute, the courts have now recognized that there are occasions on which it cannot be invoked or enforced." *Ex parte McClelland,* 521 S.W.2d 481, 485 (Mo.App.1975). *Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957), set forth the following standard for disclosure: "Where the disclosure of an informer's identity, * * * is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." In *McClelland, supra* at 485[8], the court stated: "But our extensive research, and that of counsel, has revealed no case in which the qualification of the privilege has been upheld except those in which the identification of the informant is necessary in the defense of an accused. Those cases arise in two situations, i. e.: one, where the informant is himself a witness to or participant in the crime or, two, where the reasonableness of a law enforcement officer's conduct is dependent upon the reliability of an informant. * * * We have found no other qualification to the privilege, and we will engraft none here."

■ Taking into consideration the facts and circumstances of this case and the flexible standards set forth in *Roviaro,* we do not believe that it was error to deny the request for disclosure. There is no indication here, as there has been in the cases in which the court compelled disclosure or dismissal, that the informant took part in the event or was even present. Even when the facts make it clear that the informant did participate in the crime, that factor alone is insufficient to require disclosure. "Analysis of these decisions indicates that where there is participation plus other factors, such as mistaken identity, contradictory testimony, or a denial of the accusation, or where the informant is the sole witness, then for purposes of fairness the identity may be required to be disclosed." *State v. Taylor, supra,* 508 S.W.2d at 512[9]. The information obtained here led to the arrest of Alfred, not defendant. The information regarding Alfred was apparently of as little

assistance to police as that regarding the supposed getaway car. The information, whatever it was, did not appear from the record to have led to the arrest nor to have aided in the conviction of defendant.

■ Defendant argues, in essence, that since information was allegedly given the police which prompted them to arrest Robert Alfred, the person who communicated that information must have been an eyewitness to or a participant in the offense, or that he at least had direct personal knowledge thereof. There is no actual evidence to support these conclusions. In previous cases compelling disclosure, the evidence from other witnesses made it quite clear that the person whose identity defendant sought to learn was somehow involved in, or a witness to, the criminal transaction or parts thereof. There was, therefore, some reason to believe that further useful information might be obtained. In the instant case, however, defendant has engaged in mere speculation, and that is not enough. Even actual proven participation by the informer has been insufficient, taken alone, to compel disclosure. *State v. Taylor, supra.* We cannot say that information which led to the arrest of a person other than defendant, a person who was later released, must necessarily have come from someone with sufficient knowledge of the crime to be able to shed light on the incidents of March 18, 1972. It would seem more likely that the opposite conclusion would be drawn.

■ Defendant also argues that it was error to fail to hold a hearing "to determine whether disclosure of the informant was or was not 'essential to a fair determination of the cause.'" He finds his major support in *State v. Cookson,* 361 S.W.2d 683 (Mo.1962). Defendant misinterprets the case. Defendant in *Cookson* was arrested and his apartment searched without benefit of any warrant solely on the strength of an anonymous phone call and further information later obtained from a second confidential informant. In overruling defendant's motion to suppress evidence in that case, the

trial court explicitly stated that it was relying on the ruling in *State v. Bailey,* 320 Mo. 271, 8 S.W.[2d] 57, 59[3] (1928) that law enforcement officers had an absolute and unqualified privilege to withhold their informant's identity. On appeal, the court indicated that *Bailey* had been "modified if not overruled by the court en banc in *State v. Edwards* (1958), Mo., 317 S.W.[2d] 441. * * where, * * *, the issue is the legality of an arrest or a search without a warrant, * * *." 361 S.W.[2d] at 684. It was obvious that the trial court failed to apply the principle of *Edwards* and exercise its discretion because it didn't realize the status of the *Bailey* case and incorrectly believed that it had no discretion. The *Cookson* case does not stand for the proposition that a hearing must be held. The trial court may, without a hearing and in the exercise of its discretion, determine whether defendant can have a fair trial without requiring the officer to disclose the name of his informant, when it is possessed of sufficient information as it was here.

## VI. GRAND JURY SELECTION PROCEDURES

The contention is made that the court erred in overruling the motion to dismiss the indictment. This motion charged that the grand jury was selected in violation of the equal protection clause of the Fourteenth Amendment in that it was not drawn from a representative cross-section of the community. Grand jury selection procedures are governed by § 496.160, RSMo 1969. The board of jury supervisors, comprised of circuit judges, selects 600 names to be put in the "wheel" from which names are drawn for grand jury duty. A stipulation of facts recites that some of the judges recall placing the names of Negroes in the "wheel". Defendant does not charge discrimination on their part. His attack is aimed rather at the selection process itself and takes exception to the discretion that the board has in selecting names.

■ The mere fact that the statutory method provided for grand jury selection makes discrimination possible does not render it an unconstitutional denial of the equal protection of the laws. The decisive issue is whether discrimination actually occurred in the selection of a grand jury. *State v. Ramsey,* 355 Mo. 720, 197 S.W.[2d] 949, 952[1] (banc 1946). *See also State v. Smith,* 467 S.W.[2d] 6, 7[1] (Mo.1971) (alleged discrimination on the basis of sex). A defendant's constitutional rights are violated if, in the selection of a grand jury, *deliberate* and *intentional* discrimination is shown. *State v. Smith, supra* at 7[4]; *State v. Ramsey, supra* 197 S.W.[2d] at 952[3, 4]; *see also State v. Dowe,* 432 S.W.[2d] 272, 275[6] (Mo. 1968); *State v. Kelly,* 506 S.W.[2d] 61, 63[6] (Mo.App.1974). The burden is on defendant to demonstrate *actual* discrimination. *State v. Ramsey, supra* 197 S.W.[2d] at 952[2]. Defendant here did not meet that burden.

■ Defendant relies upon United States Supreme Court and lower federal court decisions in support of his challenge to the validity of the statutory procedure employed. The cases cited do not assist him. *Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950) was not a challenge to the fairness of the statutory system. Petitioner there objected specifically to the jury commissioner's administration of the statutory scheme for grand jury selection. The Supreme Court in *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) did say, as defendant points out, that the American tradition of trial by jury contemplates an impartial jury drawn from a cross-section of the community. The Court also stated by way of clarification that prospective jurors must be selected by court officials without systematic and intentional exclusion of any group. In *United States v. Zirpolo,* 450 F.2d 424 (3rd Cir. 1971) the court found that any "deliberate interference * * * with a random jury selection * * * cripples the cross-section ideal", but that proportional representation in grand juries is not constitutionally mandated. Since defendant here failed to allege deliberate discrimination against or exclusion of blacks, or to show that such discrimination or exclusion

in fact occurred, the trial court correctly refused his motion to dismiss the indictment on this ground.

## VII. USE OF PREJUDICIAL OR INFLAMMATORY EVIDENCE

■ It is asserted that it was error to permit testimony referring to the gathering of an unruly crowd of blacks outside 1338 Banneker after defendant and the other suspects were taken away. His position is that the existence and actions of the crowd were irrelevant as well as highly inflammatory and prejudicial in that racial issues were thereby injected into the trial. The testimony objected to makes no reference to race or to the crowd's actions. At most, it demonstrates that officers from the identification bureau left the scene before they had completed gathering evidence and the search of the premises because a crowd was gathering. The state contends that it was merely attempting to explain why the officers left without seizing all the evidence at that time. The record supports this contention. It was known that sawed-off shotguns were used in the commission of the crime. None were uncovered that morning at the scene of the arrest. Several officers returned to the house on Sunday evening and found three such weapons well concealed in the bathroom. The necessity for a precipitous departure on the first occasion helps explain their failure to discover at that time weapons that were later linked to the crime.

■■ It is stated that the "relevancy of evidence in a legal proceeding depends upon whether the fact '. . . tends to prove or disprove a fact in issue, or to corroborate evidence which is relevant and which bears on the principal issue.' *State v. Tevis,* Mo.App., 340 S.W.2d 415, 420." *State v. Walden,* 490 S.W.2d 391, 393[1–3] (Mo.App.1973). We also note, however, that during a trial certain evidence may be introduced merely to aid understanding or to fill in the narrative of events. Considerable leeway is allowed even during direct examination for proof of facts not really meant to be offered as bearing directly on

disputed issues. Such evidence, if not prejudicial or inflammatory, does not present cause for reversal. *See* McCormick, Evidence, § 185, p. 439 n. 31 (2d Ed. 1972). Even if the testimony objected to was found to be irrelevant, it would certainly fall within the permissible bounds of background information. Further, evidence that is merely irrelevant or immaterial but is not prejudicial or inflammatory does not constitute reversible error. *State v. Walden, supra,* 490 S.W.2d at 393[3]. It must also appear or be shown that such evidence was unduly prejudicial or inflammatory in that it had an undue tendency to cause a decision to be made on an improper basis. *See,* e. g., *Hungate v. Hudson,* 353 Mo. 944, 185 S.W.2d 646, 648[1–5] (1945). Testimony regarding the presence of the crowd and the departure of officers was relevant to the prosecutor's explanation regarding the discovery of more directly relevant evidence, the shotguns. It was also a proper form of background information and was not prejudicial or inflammatory. The point is ruled against defendant.

## VIII. CLOSING ARGUMENT

■ Defendant's next point takes exception to certain remarks made by the prosecuting attorney during closing argument, and the court's rulings regarding them.

The first remark complained of arose as follows:

"MR. MERZ: You have to make your own decision * * * based on the evidence before you. * * * What it boils down to is do you believe that Theodore Johnson is guilty or do you want to believe that's what it all amounts to as Mr. Kimbrell said during his argument. *I don't think he ever really said Theodore Johnson is not guilty.*

"MR. KIMBRELL: I object to that, your Honor. I certainly ask it be stricken and the jury instructed to disregard it.

"THE COURT: Objection overruled. The jury will understand this is argument." (Emphasis supplied.)

Defendant's sole authority in support of the position that the remark was improper and the court's ruling erroneous is *State v. Pope,* 338 Mo. 919, 92 S.W.2d 904, 907[8] (1936). In that case the prosecuting attorney said during closing argument: " 'I honestly believe, in my heart, he is guilty. I believe he is guilty, and I believe he is guilty under the evidence.' " The court held that the remark was improper argument and reversible error because it was an appeal to the jury to convict defendant by reason of the belief of the prosecuting attorney not only as a deduction based upon the evidence but in addition also based upon the honest belief in his heart that defendant was guilty. The trial court's admonition to keep within the evidence was held insufficient to cure the error. The prosecutor here did not express a private belief in defendant's guilt. The rule was not violated here. *See also State v. Wintjen,* 500 S.W.2d 39, 43[8], 44[9] (Mo.App.1973).

We cannot agree with defendant's reasoning that the jury must necessarily have concluded from the remark that defense counsel did not believe in his client's innocence and must have further deduced from that conclusion that defendant told his attorney he was guilty. In addition, we note that defense counsel merely objected without giving his reasons therefor. The trial court was presented only with a general objection. Counsel must give reasons for the objection. "A general objection, specifying no grounds, ordinarily constitutes no objection at all." *State v. Wintjen, supra* at 43[7]. Here, as in *Wintjen,* the action of the trial court was sufficient in light of the objection made.

■ Additional comments occurred during the prosecutor's argument wherein he sought the imposition of penalties suitable for the seriousness of the crimes charged. The specific statements cited by defendant are not so clearly subject to such an interpretation as he suggests. Further, in a statement not referred to by defendant, the prosecuting attorney, in prefacing this argument, made clear the jury's job: "[Y]our job is to decide whether you believe him to be guilty beyond a reasonable doubt or not." As is clear from this portion of the argument taken in its entirety, the prosecutor was arguing the necessity of law enforcement as a crime deterrent and emphasizing the jury's responsibility for the protection of the public. So long as he stays within the record and its reasonable inferences, which he did in the case before us, the argument is proper. *State v. Jones,* 384 S.W.2d 554, 560[6] (Mo.1964).

■ Furthermore, the trial judge has a wide area of discretion in the governance of oral argument and his determination of its proper bounds will not give rise to reversible error unless there has been manifest abuse of his discretionary power. *State v. McCreary,* 504 S.W.2d 132, 136[12] (Mo.App. 1973).

■ Further error was charged in speculation by the prosecutor in closing argument that there would have been more deaths had the police not arrived. The court obviously felt that such speculation was improper for the objection was sustained, the remark stricken, and the jury instructed to disregard it. On the second occasion that the prosecutor so argued, the trial court again sustained the objection and ordered the jury to disregard the remark. The situation presented here is not analogous to that in *State v. Tiedt,* 357 Mo. 115, 206 S.W.2d 524, 528[5] (banc 1947) in which the prosecutor repeatedly indulged in improper argument in flagrant disregard of the court's ruling. In that case there was also, as to one of the improper remarks, an erroneous ruling of approval. The court here ruled properly and consistently. The prosecutor did not repeatedly commit the impropriety. Even when a remark is deemed improper, it does not follow that it was also prejudicial. *State v. Paxton,* 453 S.W.2d 923, 926[3, 4] (Mo.1970); *State v. Williams,* 419 S.W.2d 49, 51[1] (Mo.1967). Considering all the facts and circumstances of this case, the court's ruling was proper and sufficient to offset any possible prejudice to defendant. *State v. Renfro,* 408 S.W.2d 57, 60[2] (Mo.1966); *State v. Harris,* 351 S.W.2d 713, 716[4] (Mo.1961). Again we

find no abuse of the trial court's discretion and the point is ruled against defendant.

## IX. SECURITY MEASURES

Error is assigned in "ordering highly visible and excessive security arrangements" which defendant alleges intimidated the jury and expressed to them the court's belief that defendant was a dangerous individual and that threats had been made toward the jury.

■ The law makes clear that the court has the power at the commencement or during the progress of a trial to make such orders as may be necessary to secure a quiet and safe one. *State v. Kring*, 64 Mo. 591 (1877). "While care should be taken to prevent the creation of an atmosphere prejudicial to an accused, courts may take all reasonably necessary precautions for the maintenance of order during the progress of a trial * * * and for the retention of the custody of an accused." *State v. McKeever*, 339 Mo. 1066, 101 S.W.2d 22, 30[23] (1936). See also *Bibbs v. State*, 504 S.W.2d 319, 320[1], 321[3] (Mo.App.1973). In a case with facts most analogous to the case at bar, defendant claimed that the court erred in allowing two armed deputies to bring defendant into the courtroom and remain seated inside the counsel area, and in allowing one armed deputy to sit inside the counsel area, behind defendant and within five feet of the jury. The court had been informed that defendant made statements to the sheriff that he might cause a disturbance during trial. The precautionary measures were held reasonable. *State v. Johnstone*, 335 S.W.2d 199, 204[10] (Mo. 1960).

Defendant's trial was widely publicized and attracted a capacity crowd of spectators. The trial judge was informed that certain of the regular spectators had criminal records and some were at that time under bond for pending criminal charges. The court was also informed that defendant was a member of a militant group some of whose members were attending the trial. Threats had been made by anonymous callers to "get" defendant and his co-defendants if they could get close enough. At the time of the verdict a highly explosive situation developed inside and outside the courtroom which the court notes could easily have developed into a riot but for the actions of persons on security duty. There were four uniformed officers assigned to the case, two in the hallway in front of the courtroom and two in the hallway behind. The presence of police officers in the courthouse is not at all unusual. None of the uniformed officers were inside the courtroom. At the close of the state's case defendant was removed from counsel table and seated on the front bench of the courtroom between two security officers. The officers wore plainclothes and were not armed. They remained several feet from defendant. There was nothing to distinguish them from the crowd. In addition, two marked police cars and a three-wheel vehicle patrolled the vicinity when the jury travelled between their lodgings and the courtroom.

■ All but one of the cases relied upon by defendant in support of his assertion that he was prejudiced by excessive security measures involved situations in which defendant appeared before the jury shackled or manacled in some way. The cases are not on point and do not help defendant. Defendant states that his complaint is not directed at the security measures per se but at the fact that they were "blatantly paraded before the eyes of the jury." The measures taken were not unreasonable in light of the circumstances. The record does not support the charge that they were blatantly paraded before the jury. The point is ruled against defendant.

## X. ADMISSION OF EVIDENCE

A. The question presented by this point on appeal is whether the court erred in admitting into evidence a bandolier, a cartridge belt, a pistol, three black berets, a black hat and other miscellaneous items including shotgun and pistol shells and gun cleaning equipment because the articles were irrelevant, immaterial and highly inflammatory and prejudicial to defendant.

The relevant facts are, briefly, as follows. Defendant and three other persons also charged and convicted of this crime were arrested at 1338 Banneker within hours of the crime. Defendant and two others were discovered in the bedroom and placed under arrest. Among the articles taken from the drawers of the bedroom dresser at that time were a cartridge belt, a pistol for firing blanks, a bandolier, shotgun and pistol shells, and gun cleaning equipment. Officers also seized three black berets and a black hat from the top dresser drawer and the floor.

Defense counsel objected to the admission of these articles in evidence on the ground that they were unconnected with the robbery and shooting, therefore irrelevant, immaterial, and further, highly inflammatory and prejudicial. He also moved for a mistrial on the same ground. The court overruled the objections, denied the motion for a mistrial, and admitted the exhibits in evidence.

▄▄▄▄ Trial courts are vested with broad discretion to determine the relevancy and admissibility of real or demonstrative evidence. *State v. Thresher*, 350 S.W.2d 1, 6–8[5–12] (Mo.1961); *State v. Scott, supra*, 223 S.W.2d at 456[6]; *State v. McCabe*, 512 S.W.2d 442, 444[8, 9] (Mo.App.1974). As a general rule, real or demonstrative evidence is admissible only if it meets the tests of "relevancy, materiality, probative value and reasons of policy in the administration of justice." *State v. Wynne*, 353 Mo. 276, 182 S.W.2d 294, 299[6] (1944); *State v. Hicks*, 515 S.W.2d 518, 523[11, 12] (Mo.1974). More specifically, in criminal cases Missouri courts have often stated that "weapons and objects not connected with the defendant or the crime are not admissible unless they possess some probative value." *State v. Wynne, supra* 182 S.W.2d at 299[7]; *State v. Davis*, 530 S.W.2d 709, 711[1] (Mo.App. 1975). In cases in which a deadly weapon, not connected with defendant or his crime, has been erroneously admitted, courts have been quick to reverse the conviction, reasoning, as stated in 4 Wigmore, Evidence, § 1157, p. 336: "the sight of deadly weap-

ons * * * tends to overwhelm reason and to associate the accused with the atrocity without sufficient evidence." *State v. Wynne, supra* 182 S.W.2d at 299[8]; *State v. Underwood*, 470 S.W.2d 485, 486[3, 4] (Mo.1971); *State v. Merritt*, 460 S.W.2d 591 (Mo.1970); *State v. Holbert*, 416 S.W.2d 129, 133[8] (Mo.1967); *State v. Smith*, 357 Mo. 467, 209 S.W.2d 138, 141[7] (1948); *State v. Davis, supra* 530 S.W.2d at 711[1].

Citing the above line of cases, defendant contends that the admission of the items in question constitutes reversible error. Defendant argues that the exhibits proved no issue in the case, were not relevant and material because not shown to have been connected with defendant or used in the commission of the crime, and were highly inflammatory and prejudicial.

▄▄▄▄ The trial court did not err in admitting the hats. They were found shortly after the robbery and shooting, and in the same room in which defendant was arrested. Two eyewitnesses testified that at least one of the robbers wore a hat similar to a beret, although the witnesses were not asked to identify the exhibits in question. While demonstrative evidence must be shown to be connected with the crime or the accused, the identification need not be positive, absolute, certain or wholly unqualified, and "where there is some evidence for this purpose, objections to its sufficiency go to the weight rather than the admissibility of the articles in question." *State v. Threat*, 530 S.W.2d 41, 42[1] (Mo. App.1975). The record here contains sufficient evidence connecting the hats with both the defendant and the crime to bring the case within the ambit of this rule. Further, hats do not have the same propensity for creating prejudice as do deadly weapons.

▄▄▄▄ We now consider whether the bandolier, cartridge belt, blank pistol, and the collection of shells and gun cleaning equipment were properly admitted. Defendant argues that the record is devoid of any evidence connecting him with these items because he did not live at the Banneker address and because there was no evidence

that he had ever seen these objects or knew they were in the house. Defendant's view of the evidence, however, is not entirely accurate. The record reveals that the articles were sufficiently connected with defendant to meet the requirements of *State v. Cuckovich*, 485 S.W.2d 16 (Mo. banc 1972). They were found within hours of the crime in a room in which appellant was present and arrested. In *Cuckovich*, expert witnesses were unable to link the gun introduced into evidence with that used in the crime. The court quoted with approval: " '[A] weapon or instrument found in the possession of accused or of his criminal associates which, although not identified as the one actually used, is similar in form and character thereto, or which, from the circumstances of the finding justifies an inference of the likelihood or possibility of its having been used, is admissible for the purpose of showing availability to accused of the means of committing the crime in the manner in which it is shown to have occurred * * *.' " *State v. Cuckovich, supra* at 23[12] [citing 22A C.J.S. Criminal Law § 712, p. 966 (1961)]. The case at bar is distinguishable from *State v. Richards*, 334 Mo. 485, 67 S.W.2d 58 (1933), relied upon by defendant, in which the court ruled that a money bag, black rag and pistol seized from the home of an accomplice a week after the homicide was inadmissible because there was nothing to connect the articles with defendant. The court said that "articles found on a person other than the defendant on trial, long after the commission of the offense, are not admissible against the defendant minus a showing of some connection of the articles with the defendant." *State v. Richards, supra* at 60[1]. In light of defendant's strong alibi evidence and the absence of any strong evidence to link defendant with the crime, the court in *Richards* could not say that admission of the gun was harmless error. *State v. Richards, supra* at 61[2–4]. Neither of those weaknesses is present here.

Here, the items in question were found in the same house with two shotguns, a pistol and a knife, all identified as weapons used in the commission of the robbery and shooting. The articles were found in a dresser with other items about which no question was raised. The top drawer of the dresser located in the bedroom where defendant was arrested also contained the pistol of the police officer killed during the robbery. The bottom drawer also contained a knife identified by a witness as being the one carried by one of defendant's associates at the time of the robbery. Although the exhibits in question were not identified by eyewitnesses as being used in the robbery, they show the availability to defendant of the means to commit the crime in the way that it occurred. Defendant's response, although not clearly articulated, appears to be that to adopt such a line of reasoning, in a situation in which the connection between the exhibits and both defendant and the crime is so attenuated, stretches the concept of logical relevance too far, thus violating his right to be tried only on relevant and competent evidence bearing on the issue of guilt or innocence. We do not find the links between these items and defendant and the crime at all "attenuated" and hence do not find them inadmissible on that ground.

In addition to arguing that the facts bring this case within the *Cuckovich* ruling, the state also contends that these articles were properly admitted because they were probative of the issues of malice and intent. The state's position is that the exhibits demonstrated that the defendants were well organized, well armed, and involved in a common scheme to commit violent crime. The argument has merit. It is clear in this state that "[a]rticles showing motive, or malice, or intent, or knowledge or preparation, may be received in evidence if shown to be connected with the crime or with the accused." *State v. Evans*, 237 S.W.2d 149, 151[1, 2] (Mo.1951).

The exhibits complained of were relevant to the issues of malice and intent and the availability to defendant of the means of committing the crime in the manner in which it occurred. If competent and relevant evidence is received, it does not

become erroneous or inadmissible merely because it is prejudicial. *State v. Wells*, 367 S.W.2d 652, 655[9] (Mo.1963); *State v. King*, 334 S.W.2d 34, 38[6] (Mo.1960). It is also within the discretion of the trial court to determine whether potentially prejudicial or inflammatory evidence should be admitted. *State v. McCabe, supra*, 512 S.W.2d at 444[9]. It cannot be said that the trial court here clearly abused its discretion. Defendant's contention is without merit.

B. Before removing the articles just discussed from the dresser drawers, officers took photographs of those drawers and of the bedroom. At trial, defense counsel objected to the introduction of the photographs. Potentially inflammatory matter was cut from two of the photos and erased from the others. Defense counsel renewed his objection because, in his opinion, the jury could translate the erased matter on one exhibit into a "manual for guerrillas" and because "the combination of the alterations will make it quite obvious to the jury that some inflammatory matter is being hidden from them."

 The trial court here quite properly altered the photographs sought to be introduced into evidence to remove any potentially prejudicial or inflammatory matter not otherwise relevant. *State v. Crossman*, 464 S.W.2d 36, 41[3] (Mo.1971); *State v. Hicks*, 438 S.W.2d 215, 220[10] (Mo.1969). If objectionable portions of otherwise relevant photographs are concealed, their admission cannot be prejudicial error. *State v. Crossman, supra.*

For the remainder of defendant's argument to be accepted, it is necessary to accept his assertion that any relevancy, materiality or probative value of the photographs was outweighed by their prejudicial effect because they showed that the Banneker house was a headquarters for black militants. We do not agree. If such impression was conveyed to the jury it was not by means of these photographs. They were effectively altered to avoid that possibility. It is mere speculation to assume that the jury would translate two visible words, "manual" and "the" into "manual

for guerrillas" and go on to determine that the Banneker house was a black militant headquarters.

 Trial courts have wide discretion in determining the admissibility of photographs. *State v. Jackson*, 499 S.W.2d 467, 472[5–8] (Mo.1973); *State v. Strong*, 484 S.W.2d 657, 661[13, 14] (Mo.1972); *State v. Vineyard*, 497 S.W.2d 821, 829[19–21] (Mo. App.1973); *State v. Smith*, 485 S.W.2d 461, 467[13] (Mo.App.1972). Photographs are admissible when they are helpful to show relevant facts or when they help to clarify and corroborate the testimony of witnesses. *State v. Smith, supra.* The court in *State v. Jackson, supra*, 499 S.W.2d at 472[5–8], noted that even potentially inflammatory photographs are admissible if they tend to prove any material element of the state's case and that they are generally admissible if they corroborate the oral testimony of the state or refute defense testimony.

 The exhibits in question were illustrative and corroborative of the testimony of police officers regarding the discovery of articles clearly connected to the crime and relevant to the state's case. The trial court carefully considered their admission; one photograph was excluded because of inflammatory matter on the walls. They were introduced solely to illustrate and corroborate the witnesses' testimony. A photograph is not inadmissible merely because oral testimony has described what it depicts. *State v. Jackson, supra* at 472[8]. Pictures provide a much clearer impression than do verbal descriptions. That is why they are used. *State v. Strong, supra* 484 S.W.2d at 661[13, 14]. No abuse of discretion was committed by admitting these photographs into evidence.

 The same rules apply to an additional photograph complained of which depicts defendant shortly after the arrest but dressed only in overalls supplied by the Maplewood Police. The state points out that the photograph was relevant to show defendant's appearance at the time. He had facial hair when arrested and was clean-shaven at the time of trial. The pho-

tograph was not of the sort that must be excluded because its prejudicial and inflammatory effect outweighs its relevance. See *State v. Smith, supra* 485 S.W.2d at 467[13]. We must agree with defendant that the two lineup photos adequately portrayed his appearance at the time of arrest. The photograph, therefore, was cumulative, *i. e.,* "additional evidence of the same kind tending to prove the same point as other evidence already given." *State v. Harris,* 334 Mo. 38, 64 S.W.2d 256, 258[3] (1933). It is, however, clearly within the trial court's discretion when cumulative evidence should stop, relevance being the main criteria in the exercise of that discretion. *State v. McCabe, supra,* 512 S.W.2d at 444[5–9]. Admission of the photograph was not error.

## XI. IDENTIFICATION PROCEDURES

Defendant asserts that it was error to permit in-court identification of defendant by four eyewitnesses to the incident and testimony of extra-judicial identifications by the same four persons and an additional eyewitness.

Defendant filed a motion to suppress all evidence of extra-judicial identifications and all in-court identifications arguing basically that the identification procedures employed were so unduly suggestive as to be violative of due process and that he had been denied effective assistance of counsel due to police restrictions imposed at the second lineup. A hearing was held and the motion denied, the court finding that the lineups and photographic displays were proper and not violative of defendant's constitutional rights.

■ We find without merit defendant's claim of denial of effective assistance of counsel at the lineup which he supports by citation to numerous cases but by reliance primarily upon *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); and *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

"Both *Wade* and *Gilbert* extended the sixth amendment's right to counsel to post-indictment confrontations, specifically lineups, at which the accused is sought to be identified as the perpetrator or one of the perpetrators of the particular crime alleged in the indictment. *Kirby* construed *Wade's* right to counsel to attach at or subsequent to the time when 'adversary judicial proceedings' have been instituted against the accused. Under Missouri procedure, the right to have counsel present at confrontations attaches when defendant has been indicted or an information has been filed against him, since these acts are the equivalent of the initiation of 'adversary judicial proceedings.'"

*State v. Jordan,* 506 S.W.2d 74, 80[9, 10] (Mo.App.1974). No indictment or information had been filed at the time of the lineups. Defendant was not entitled to have counsel present. His claim that the procedures imposed upon representatives of the Public Defender's office who were present at the lineups denied him effective assistance of counsel is therefore not cognizable. This issue has now been finally settled. *Morris v. State,* 532 S.W.2d 455 (Mo. banc 1976).

*Stovall v. Denno, supra,* and *Kirby v. Illinois, supra,* do make clear, however, that identification procedures that are unnecessarily suggestive and conducive to irreparable misidentification constitute a denial of due process secured the accused under the Fifth and Fourteenth Amendments. If the lineups, when examined, are found to have suffered such constitutional infirmity, defendant's motion to suppress testimony resulting from suggestive identification procedures should have been granted. *State v. Jordan, supra* 506 S.W.2d at 81[11–14].

There were two lineups involving defendant. The first occurred on March 18, approximately eleven hours after the incident, at the Maplewood Police Station and included defendant, Toney, Davis, Jones and Alfred and three other persons. Witness Laura Miller attended this lineup and at trial testified that she identified appellant

and Davis. A second lineup was held at the St. Louis County Police Department in Clayton. Joyce Sullivan and Thomas Canfield viewed this lineup which also included defendant. Miss Sullivan testified that she picked out defendant and Jones. Mr. Canfield stated that he identified Davis and Toney and made a tentative identification of defendant but was unable to make an in-court identification. There is nothing to indicate suggestiveness in the conduct of these lineups.

Owen Kelly was severely wounded during the incident and was immediately hospitalized. He had been seated approximately six feet from the front door of the tavern. Before he was forced to lie on the floor he turned and saw two of the robbers. When he was shown a photograph and a videotape of the county lineup while still hospitalized he was able to identify defendant with certainty and Toney somewhat less positively. Sandra Clemens, also wounded during the incident, testified that a black person came into the tavern at about five o'clock that afternoon and that she sold him potato chips, a bag of peanuts and a soft drink. She made an in-court identification of defendant as that person. She had been shown the videotape of the county lineup but did not identify defendant at that time. Witnesses Kelly, Sullivan and Miller also made in-court identifications of defendant on direct examination. Sandra Clemens' in-court identification of defendant was elicited by defense counsel on cross-examination.

■ Although defendant attacks on various grounds every single viewing of himself or his likeness by all witnesses who testified, a substantial portion of his attack is directed at testimony as to occasions during preparation for trial at which witnesses were shown photographs of defendants by the prosecuting attorney. If initial identification procedures were not improper or impermissibly suggestive, they were not violative of defendant's constitutional rights. In addition, if subsequent in-court identifications of appellant are found to have a basis independent of any improper procedure,

such identifications are admissible despite potentially suggestive pre-trial identification procedures. *State v. Ross,* 502 S.W.2d 241, 246[2] (Mo.1973); *State v. Taylor,* 496 S.W.2d 822, 824[3, 4] (Mo.1973). Because it was not error to admit identification testimony on the above stated basis, it is unnecessary to review here each step in the prosecuting attorney's preparation of this case subsequent to initial identifications of defendant by these witnesses. Not finding any evidence that would have required suppression of the witnesses' identification testimony, the point is ruled against defendant.

## XII. SEARCH AND SEIZURE

■ Defendant's twelfth point on appeal states: "The court erred in overruling appellant's motion to suppress physical evidence." Such a statement standing alone without any indication wherein and why the court erred totally fails to comply with Rule 84.04(d) and is therefore not preserved.

■ We note gratuitously, however, that appellant's claim that there was no probable cause for his arrest is without foundation. Police officers were informed that four or five negro males had committed the offense and that Toney had been seen in the area earlier. Pursuing this lead three officers went to Toney's house and talked with his mother who behaved in an agitated and suspicious manner and finally ran down the street and shouted, "Lucius, Lucius, the police." Toney, when approached, told the officers he didn't mind if they looked around and that only "some girl" was inside the Banneker residence. When they entered, however, he then pushed past one of the officers and ran into the bedroom shouting, "No, some guys." Almost simultaneously Officer Boulch saw someone run into the bathroom and saw two other men in the bedroom. Toney fit the general description given by witnesses. Officer Boulch observed what appeared to be the butt of a gun partially concealed on the bedroom floor and another gun in an open dresser drawer. Probable cause to

arrest arose from information previously obtained, including a general description of the perpetrators, the highly suspect behavior of the occupants of the house and the items seen in plain view. Defendant's warrantless arrest, given his presence with these persons, surrounded by these items, and in light of the information police officers had at that time, was clearly supported by probable cause. See *State v. Gant,* 490 S.W.2d 46, 47[1] (Mo.1973); *State v. Ward,* 457 S.W.2d 701, 705[2–6] (Mo.1970); *State v. Sampson,* 408 S.W.2d 84, 86[1] (Mo.1966); *State v. Henderson,* 510 S.W.2d 813, 818[1] (Mo.App.1974).

To summarize defendant's additional contentions, he argues that the consent of the co-lessee, Toney, to search the premises was invalid because coerced; that, if valid, it was withdrawn. He maintains that the search and seizure was in violation of his constitutional rights, no search warrant having been obtained, and that even if the search was incident to a lawful arrest it was overbroad. Toney, as tenant of the premises, had the right to authorize the officers' entry. *State v. Gailes,* 428 S.W.2d 555, 558[2] (Mo.1968). Toney was not coerced into giving his consent. There is no indication that he was "surrounded" by police officers as defendant maintains. The evidence indicates that Sergeant Boulch approached him, displayed his identification, and asked who was inside and whether he minded if he looked around, to which Toney responded, "No, go ahead." Sergeant Boulch entered and went towards a bedroom door when he heard someone running towards him (Toney) and as he turned Toney said "No, some guys." Toney's latter statement is far more clearly a correction of his earlier remark that "some girl" was inside than it is a retraction of consent to search.

Furthermore, the case falls within an exception recognized in *State v. Wiley,* 522 S.W.2d 281, 290[16, 17] (Mo. banc 1975). Exigent circumstances as noted herein indicated to the officers that removal or destruction of the evidence was imminent or threatened. The validity of the search and seizure in the instant case may be sustained on the limited ground that an emergency situation developed which threatened the removal or destruction of evidence that officers had cause to believe was present and relevant to the crime being investigated. Under the circumstances, the actions of the police were not unreasonable and the motion to suppress was properly overruled.

## XIII. ADDITIONAL POINTS RELIED ON

Defendant's brief contains additional contentions of trial error which do not comply with the rules regulating briefs on appeal. They are: "XIII THE COURT ERRED IN OVERRULING APPELLANT'S MOTIONS FOR PRODUCTION OF DOCUMENTS, STATEMENTS OF WITNESSES, AND GRAND JURY TRANSCRIPTS, AND TO CERTIFY QUESTIONS ON DEPOSITIONS" and "XIV THE COURT ERRED IN DENYING APPELLANT'S MOTION FOR SEVERANCE OF THE COUNTS." These charges of error, completely lacking any specific reasons, fail to indicate wherein and why error was committed. In this they do not comply with Rule 84.04(d) and will not be considered for review on appeal. *State v. Foster,* 513 S.W.2d 657, 659[1] (Mo. App.1974).

Several additional points have no merit. As to them, we have examined the record and we find no error. Any discussion or reference to them would have no precedential value.

The judgment is affirmed.

DOWD and RENDLEN, JJ., concur.