**STATE of Missouri, Respondent,**

v.

**Jackie MARTIN, Appellant.**

**No. WD 31116.**

Missouri Court of Appeals,
Western District.

Oct. 1, 1980.

As Modified On Court's Own Motion.

Nov. 3, 1980.

Motions for Rehearing and/or Transfer to Supreme Court Denied Nov. 3, 1980.

Application to Transfer Denied
Dec. 15, 1980.

Clifford A. Cohen, Public Defender, Gary L. Gardner, Asst. Public Defender, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before TURNAGE, P. J., and SHANGLER and MANFORD, JJ.

MANFORD, Judge.

This is a direct appeal from a jury conviction for robbery, first degree, and the second offense of armed criminal action. The jury assessed punishment of nine years for the robbery conviction and seven years for the armed criminal action. Pursuant to § 546.430, RSMo 1978, the trial court reduced the sentences to seven years and five years respectively, said terms to run consecutively. The judgment is reversed in part and affirmed in part.

Two points are presented on this appeal. Appellant first alleges the trial court erred in its failure to dismiss Count II of the information, which alleged armed criminal action, because that count placed appellant in double jeopardy. As his second point of error, appellant charges the trial court committed plain error by admitting into evidence a black .38 caliber revolver, because the revolver was irrelevant to the offense charged and its admission was prejudicial.

On January 6, 1978, at approximately 3:30 p. m., appellant was observed by two employees of the Avis-Rent-A-Car offices in downtown Kansas City, Missouri. Appellant was observed looking up and down the street. He then entered the office and asked to rent a car. When appellant was

asked for his driver's license, he produced a gun, demanded money and a car. Upon this demand, an employee handed appellant $266.00 and the keys to a rental automobile. At this point, a third employee entered the office, requesting assistance from his fellow employees to load a lawnmower into a motor vehicle. This third employee passed through the office, apparently unaware of the robbery in progress. This third employee then reentered the office and during his reentry, appellant passed this employee while making his escape.

The three employees then observed appellant enter a black Oldsmobile. Appellant departed that vehicle and then entered a black Monte Carlo. As appellant drove the Monte Carlo away, he was also observed by the three employees.

The police were alerted. The following day, appellant was observed driving the stolen vehicle and after a high-speed vehicular chase and a brief foot-chase, appellant was apprehended by the police.

Following his trial, conviction and the overruling of his timely filed motion for new trial, appellant lodged this appeal. At this juncture, appellant's first point is taken up and sustained. This court is bound to follow the last controlling decision of our State Supreme Court on any issue, see *State v. Wood*, 531 S.W.2d 543 (Mo.App. 1975) and Mo.Const. Art. V, § 2.

■ In his point one, appellant alleges that conviction for armed criminal action, pursuant to § 559.225(1), RSMo Supp.1976, and in addition to conviction for armed robbery, first degree, places an accused in double jeopardy. It would serve no purpose to reiterate herein the debate which has ensued over this issue, and it suffices to state that upon a split decision, our State Supreme Court has decided the question on the basis that conviction for armed robbery and armed criminal action constitutes double jeopardy when the facts necessary to prove conviction for one offense also constitute the necessary facts to prove the second offense. An exhaustive analysis of the subject is to be found in and the reader is referred to *Sours v. State*, 593 S.W.2d 208 (Mo. banc 1980) (decision vacated by order of the United States Supreme Court on May 27, 1980 and reconsideration ordered) and the most recent decision, *Sours v. State* (No. 61458, handed down by the Missouri Supreme Court [en banc] on August 18, 1980), reinstating the original decision. Pursuant to the August 18, 1980 decision of *Sours v. State, supra*, point one raised by appellant is sustained.

Appellant's remaining alleged error charges the trial court with the commission of plain error in the admission of a black .38 caliber revolver because said revolver was irrelevant to the proof of the charge against appellant, and any probative value such evidence might have had was outweighed by its inherent prejudicial effect upon appellant's right to a fair trial.

Appellant invokes review for plain error. Such review could also be made upon the court's own motion pursuant to Rule 29.-12(b) to determine any manifest injustice or miscarriage of justice.

In support of his second alleged error, appellant cites three cases for this court's consideration. These authorities are found to be distinguishable from and not controlling of the instant case. The first authority, *State v. Williams*, 543 S.W.2d 563 (Mo. App.1976) involved a conviction for carrying a concealed weapon and the court reversed and remanded the lower court's decision, holding that the introduction of a second weapon found in an automobile in which the accused was a passenger was irrelevant to a conviction for carrying a concealed weapon, and that repeated reference to the second weapon was prejudicial error. *State v. Charles*, 572 S.W.2d 193 (Mo.App.1978) involved a reversal for second degree murder and robbery where repeated questioning of the accused about the weapon he carried at a prior time (a weapon actually in possession of the police at the time of the present offense) and repeated prosecutorial comments about the particular weapon were improper. *State v. Davis*, 530 S.W.2d 709 (Mo.App.1975) involved a reversal upon admission of a sawed-off shotgun which was not found in the possession of the ac-

cused or his criminal associates or under circumstances that justified inference of likelihood or possibility of its having been available to defendant for use in robbery or otherwise connected with defendant.

In the instant case, appellant argues that the admission of a .38 caliber Smith & Wesson blue steel revolver was a plain error because the revolver was irrelevant to the proof of the offense charged. Appellant's argument is premised upon the testimony of the victims of the robbery.

Appellant contends that since two of the victims testified that they told the police the gun used in the robbery was silver in color, and that the gun recovered by the police was black, inherent prejudicial error was committed. If this court were to cease with such limited consideration of the evidence in the record of this case, appellant's argument might tend to acquire some semblance of merit. Reference to the entire evidence dispels appellant's contention however.

Two of the employees of the business that was robbed positively identified appellant as the robber. An additional employee witness observed appellant's flight from the scene of the crime. Regarding identification of the gun, the first witness testified:

"Q. (By Mr. Schaffer, prosecuting attorney) I'm going to hand you what has been marked State's Exhibit No. 5 and ask you if you can identify that?

A. It looks rather like the one that he had.

Q. Okay. When I hold it and it is empty. When I hold it in this position, is there anything different about it?

A. No.

Q. To the best of your knowledge, it is the same gun that he had in his possession that same day that he robbed you with?

A. To the best of my knowledge.

Q. Did he have anything on his hands while he was robbing you?

A. He was wearing gloves.

Q. By the way, I asked you to identify State's Exhibit No. 5 and you said it looks rather like the weapon that the defendant was carrying. Would you just for the record, would you say what that object is?

A. State's Exhibit No. 5?

Q. Yes, what is it?

A. It's a gun."

That line of questioning was then followed by cross-examination of the witness as follows:

"Q. All right. Does this look like the gun?

A. Yes, it does.

Q. What color is this?

A. Well, it's black.

Q. Black?

A. Yes.

Q. Right?

A. Yes.

Q. That's the color you gave the police on the day of the robbery?

A. Well, I told them it was a silver color with the light shining on it. It does kind of look silver.

Q. I didn't ask you that. I asked you what did you tell the police on the day of the robbery?

A. That it was silver.

Q. Told them it was color, didn't you?

A. Not shiny.

Q. What color would you call silver? Is that silver enough for you?

A. Yes.

Q. You told them it was that color?

A. It's not shiny.

Q. Isn't silver usually shiny? That's black.

A. I have a silver car.

Q. Let me just ask you this, Mrs. S___. What color did you tell the police the gun was?

A. Silver.

Q. Are you saying today that the gun was black or silver?

A. The gun here is black and I told the police that it was silver.

Q. All right.

A. Silver and gray to me are the same color.

Q. Well, is this silver gun that you think that you saw on that day?

A. It looks very much like the gun that I saw that day.

Q. All right. But you do know this gun is not silver?

A. Yes.

Q. Now, all I'm getting at Mrs. S___ is on the day—Let's see, maybe it is. At any rate, you described the gun as a silver gun. Silver, gray and black all look the same or is it silver and gray?

A. Silver and gray.

Q. Is this the color of gray you're talking about?

A. With the lights the way they were, it did look gray. It's brighter there and the sun shines in the office a lot more than in here.

Q. So, you think that may have been the gun?

A. Yes, I do."

The foregoing testimony was then followed by another employee's testimony on the same issue:

"Q. Now, you mentioned that as he came in and stood in front of that counter he pulled a revolver. I'll show you what has been marked as State's Exhibit No. 5 and ask you if you can identify this?

A. Yes, that's the weapon.

Q. You think it is?

A. I think it is.

Q. Does it appear to be the same weapon?

A. I think so.

Q. Okay. Is there anything different about it that you can see today? Anything different about it and a weapon that appeared on January 6, 1978?

A. No, I don't think so."

and this second employee then testified upon cross-examination as follows:

"Q. All right. Have a seat. Now, isn't it true, you looked at the gun the robber had on that day, didn't you?

A. Yes.

Q. And isn't it true that you told the police that it was a chrome plated pistol?

A. Yes, I did.

Q. Is this a chrome plated pistol?

A. No.

Q. And this doesn't look like the pistol, does it?

A. It looks like a pistol, yes.

Q. It's not chrome plated.

A. No, but it still looks like a pistol.

Q. Here is what I'm saying. You described a pistol, you told the police, is this chrome plated?

A. Yes.

Q. Chrome plated is the color of a bumper?

A. It is.

Q. And you told the police the pistol was the color of a a [sic] chrome plated?

A. Yes.

Q. Is that true?

A. That's true.

Q. You see this pistol? Is this pistol chrome plated?

A. No, it's not.

Q. It's not chrome plated?

A. No.

Q. Do you want to rub to see if it's chrome plated underneath there? It's not chrome plated at all, is it?

A. No.

Q. How do you say that the pistol was the color of the pistol but the pistol you got is black but it looks like the pistol that they had on the day of the robbery?

A. It's still a pistol.

Q. It's still a pistol?.

A. Yes.

Q. Even though it's not chrome plated?

A. That's right.

Q. The pistol you saw on the day of the robbery was chrome plated, is that right?

A. I don't know.

Q. So, you don't know what color the pistol was, do you?

A. No, I know it was a pistol, that I saw.

\* \* \* \* \* \*

Q. You have admitted that you were in error on your testimony on the pistol, haven't you?

A. That's possible."

The evidence continued with the testimony of the police officer who arrested appellant. The testimony relevant to the issue of the gun is as follows:

"Q. So, you were a police officer on January 7, 1978?

A. Yes, I was.

Q. Do you recall whether or not you were actually working on that day?

A. Yes, I was working.

\* \* \* \* \* \*

Q. Did you have occasion, now, directing your attention to around the hour of eleven o'clock in the morning on that date, did you have occasion to go to the vicinity of 12th and Garfield?

A. Yes.

Q. Why was it you went there?

A. To meet my captain, Captain Steven Neefer.

Q. What happened when you got there?

A. He showed me a black '77 Monte Carlo, Missouri license Y54193. Stated it was a stolen car taken in a robbery and asked me to set up a surveillance.

Q. What was that?

A. Y54193.

Q. Did you take any action in response to his order?

A. Yes, I set up a surveillance down the street about a block from the car.

\* \* \* \* \* \*

Q. Did anything happen with regard to that car before the day was over?

A. At approximately 12:50 hours a Negro male and Negro female got in the car and drove down the street toward us.

\* \* \* \* \* \*

Q. What did they do once they had entered the car?

A. They drove it in the direction I was sitting.

Q. What happened next?

A. They drove right by us and we pulled in behind them and proceeded on down 13th Street to Prospect. They went south on Prospect to the freeway entrance. We followed them on to the freeway. At 27th Street he evidently noticed we were behind him because he speeded up and we put the red light on.

\* \* \* \* \* \*

Q. Now, referring back to—did you tell the jury the persons in the car, this '77 Chevrolet Monte Carlo got off on 27th Street exit?

A. Yes, he did.

Q. What happened next?

A. He got off on the 27th Street exit and sped up to, attempting to elude us. We have a portable red light we keep in the car and I put it up on top of the car and we had our siren and he proceeded on westbound 27th Street at a high rate of speed.

\* \* \* \* \* \*

Q. What happened, did you follow them?

A. Yes, we pursued him west bound on 27th Street to Askew at which time he made a right turn and went northbound on Askew approaching 26th Street. As he approached 26th Street he attempted to make a

left—but he lost control of the car and slid into a house. He bailed out of the car and jumped over the fence. I bailed out of the police car and ran right after him. We went over two fences and he started to go through a yard of another house and there was another officer coming down the other street and he turned back at which time when he turned back he reached into his side to pull what I believed to be a revolver, at which time I drew my weapon and he pitched the weapon in the bushes and he was subdued and arrested at that time.

Q. Did you at any time loose [sic] sight of the '77 black Monte Carlo with the aforementioned license plates?

A. No, sir.

Q. Did you at any time after that car had crashed and that person bailed out and began to run, did you at any time loose [sic] sight of that person?

A. No, I did not.

Q. Did you actually see that person toss the gun somewhere?

A. Yes, I did.

Q. And where was it that he tossed it?

A. He tossed it in some bushes right beside where he was standing.

Q. Were you the officer who actually made the arrest?

A. I was one of the officers.

Q. Who was the person who had been driving the car and pitched the gun and ran?

A. The gentleman at the table there in the blue suit.

Q. Do you know his name?

A. I do now. Jackie Martin.

\* \* \* \* \* \*

A. After we wrestled him to the ground I reached over and picked up the gun and put it in my waistband and transported him to the station.

Q. When you reached over and picked the gun up, was the gun in the same area you had seen him throw it?

A. Yes, it was.

Q. I'm handing you what has been marked State's Exhibit No. 5. Can you identify that, please?

A. It's a .38 Smith and Wesson blue steel revolver, appears to be the one I found at the scene there that day."

Then, on cross-examination, the officer testified:

"Q. State's Exhibit No. 5, Officer, you identified as blue steel .38 cliber [sic] Smith and Wesson, is that correct?

A. Yes, I did.

Q. That's the gun that you saw Jackie Martin throw into the bushes?

A. Yes, sir.

Q. Not a chrome plated one?

A. No, sir.

Q. Not a nickel plated one?

A. No, sir."

Appellant's argument is premised upon the testimony of the state's witnesses that identification of the gun in question was only "similar" to the one used in the robbery and, from that, appellant contends it was plain error for the gun to have been admitted into evidence.

■ To be sure, the general rule regarding any weapon or object not connected with a crime for which the accused stands charged is inadmissible unless such weapons or objects have some probative value, see *State v. Duncan*, 540 S.W.2d 130 (Mo.App. 1976); *State v. Johnson*, 539 S.W.2d 493 (Mo.App.1976), cert. denied 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); but the determination of the proper admission turns upon whether or not there is evidence to connect the weapon or object with the crime or with the accused, see *State v. Duncan, supra; State v. Threat*, 530 S.W.2d 41 (Mo.App.1975) and *State v. Thompson*, 559 S.W.2d 34 (Mo.App.1977).

■ Identification of demonstrative evidence must be connected with a crime or the accused, but that identification need not be absolute, positive, certain or entirely unqualified when related to the question of admissibility, see *State v. Chambers*, 550 S.W.2d 846 (Mo.App.1977); *State v. Lawson*, 585 S.W.2d 247 (Mo.App.1979); *State v. McAllister*, 534 S.W.2d 611 (Mo.App.1976); *State v. Threat, supra; State v. Holman*, 556 S.W.2d 499 (Mo.App.1977) and *State v. Kern*, 447 S.W.2d 571 (Mo.1969).

■ The equivocal identification of the gun in the instant case went to the weight of such evidence, and that determination was for the trier of fact. This question has been summarized as follows and finds direct application in the instant case:

> "The identification of an item at trial need not be entirely unqualified, as the weight to be given to identity is for the jury . . . [citations omitted] . . . Testimony concerning an exhibit that it 'looks like', 'looks familiar', 'very much like', 'very similar', etc., to an involved object, has been held sufficient to warrant its admission into evidence." *State v. Ridinger*, 589 S.W.2d 110, 113 (Mo.App. 1979).

The testimony in the instant case brings this case within the rule of *State v. Ridinger, supra.*

In addition, it should be pointed out that at the time of his arrest, appellant had been driving the stolen Monte Carlo and just prior to his being physically subdued, he threw a .38 caliber handgun into some bushes in the immediate area of his arrest. There is authority for the admission of such evidence under a general precept that "a weapon found in the possession of an accused, or of his criminal associates, even if not identified as the weapon actually used in the commission of the crime, is admissible if similar in form and character to the one used," quoted in *State v. Benson*, 574 S.W.2d 440, 442 (Mo.App.1978), citing also *State v. Cuckovich*, 485 S.W.2d 16 (Mo. banc 1972). *State v. Benson, supra*, also stands for the rule that identification of a weapon need not be wholly unqualified to make it admissible.

In the instant case, the testimony of the witnesses relating to state's exhibit no. 5, the .38 caliber revolver, is a matter of the weight and sufficiency of such evidence and not its admissibility. Such weight and sufficiency falls within the purview of the triers of fact.

There was no plain error in the admission of state's exhibit no. 5. By its admission, no manifest injustice or miscarriage of justice occurred. Under the facts and circumstances of the instant case as well as pursuant to authorities cited herein, point two presented by appellant is ruled against him.

For the reasons set forth herein, that portion of the judgment related to the conviction for armed criminal action is herein reversed.

For the reasons set forth herein, that portion of the judgment related to the conviction for armed robbery, first degree, is in all respects affirmed.

All concur.